# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY; WESTERN WATERSHEDS PROJECT,<br><br>    Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, Secretary of the Interior, in his official capacity; WILLIAM PENDLEY, Deputy Director, Bureau of Land Management, in his official capacity; and MARGARET EVERSON, National Park Service, in her official capacity,<br><br>    Defendants. | Civil Action No. 1:20-cv-1224-TSC |

## DEFENDANTS' COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK ......................................... 2

    A.    The Bureau of Land Management and the National Park Service .......................... 2

    B.    The Federal Vacancies Reform Act. ................................................................... 3

FACTUAL BACKGROUND ........................................................................................ 5

PROCEDURAL BACKGROUND ............................................................................... 7

SUMMARY JUDGMENT STANDARD OF REVIEW .......................................... 8

ARGUMENT .................................................................................................................. 8

I.    PLAINTIFFS HAVE FAILED TO ESTABLISH STANDING. ........................................ 9

    A.    Plaintiffs Are Not Entitled to a Lower Bar For Standing and Must Establish a Concrete Injury-in-Fact to Meet the Constitutional Standing Requirement. ........ 10

    B.    Plaintiffs Have Not Demonstrated Organizational Standing. ............................... 12

    C.    Plaintiffs Have Not Established Representational Standing on Behalf of Their Members. ....................................................................................................... 19

    D.    Plaintiffs Seek Relief Beyond This Court's Remedial Jurisdiction. ..................... 27

II.    THE SECRETARY LAWFULLY DELGEATED NON-EXCLUSIVE DUTIES OF THE NPS DIRECTOR TO MS. EVERSON. ........................................................................... 29

    A.    The FVRA Itself Authorizes the Delegation of Non-Exclusive Duties of the Director of NPS ............................................................................................. 31

    B.    Plaintiffs' Challenge to the Duration of the Delegations Fails. ........................... 38

III.    AN ADMINISTRATIVE RECORD INDEX IS NOT REQUIRED AT THIS **S**TAGE . 42

CONCLUSION .............................................................................................................. 44

i

# TABLE OF AUTHORITIES

**CASES**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ............................................................ 10, 13

*Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*,
365 F. Supp. 3d 118 (D.D.C. 2019) ............................................................ 24

*Allen v. Wright*,
468 U.S. 737 (1984) ............................................................ 9

*Am. Legal Found. v. FCC*,
808 F.2d 84 (D.C. Cir. 1987) ............................................................ 24

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ............................................................ 14, 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................ 8

*Baker v. Carr*,
369 U.S. 186 (1962) ............................................................ 40

*Bhatti v. Fed. Housing Fin. Agency*,
332 F. Supp. 3d 1206 (D. Minn. 2018) ............................................................ 40, 41

*Blackburn v. Goodwin*,
608 F.2d 919 (2d Cir. 1979) ............................................................ 29

*Blair v. United States*,
250 U.S. 273 (1919) ............................................................ 12

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................ 3, 8

*Bullock v. BLM*, No. 4:20-CV-00062-BMM,
2020 WL 5746836 (D. Mont. Sept. 25, 2020) ............................................................ 17, 28, 37

*Bullock v. BLM*, No. 4:20-CV-00062-BMM,
2020 WL 6204334 (D. Mont. Oct. 16, 2020) ............................................................ 28

*Byrne v. Brock*,
No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ............................................................ 18

*Byrne v. Clinton*,
410 F. Supp. 3d 109 (D.D.C. 2019) ............................................................ 18, 20

*Carney v. Adams,*
   --- S. Ct. ----, 2020 WL 7250101 (U.S. Dec. 10, 2020)...................................................... 9, 21

*Carroll v. Office of Fed. Contract Compliance Programs, United States Dep't of Labor,*
   235 F. Supp. 3d 79 (D.D.C. 2017) ..................................................................... 43, 44

*Casa de Maryland v. Wolf,* --- F.,
   Supp. 3d ----, 2020 WL 5500165 (D. Md. Sept. 11, 2020).................................................... 42

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)....................................................................................... 8

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)...................................................................................... 18

*Collins v. Mnuchin,*
   938 F.3d 553 (5th Cir. 2019), *cert. granted,* No. 19-422, 2020 WL 3865248 (U.S. July 9,
   2020), *and cert. granted,* No. 19-563, 2020 WL 3865249 (U.S. July 9, 2020)........................ 12

*Comm. on Judiciary of United States House of Representatives v. McGahn,*
   968 F.3d 755 (D.C. Cir. 2020) ........................................................................... 12

*Conservative Baptist Ass'n of Am., Inc. v. Shinseki,*
   42 F. Supp. 3d 125 (D.D.C. 2014) ....................................................................... 24

*Coulibaly v. Pompeo,*
   318 F. Supp. 3d 176 (D.D.C. 2018) ...................................................................... 26

*Ctr. for Biological Diversity v. Bernhardt,*
   No. 19-CV-02898 (APM), 2020 WL 5702087 (D.D.C. Sept. 24, 2020)................................... 15

*Ctr. for Biological Diversity v. EPA,*
   274 F.R.D. 305 (D.D.C. 2011)............................................................................ 22

*Ctr. for Biological Diversity v. EPA,*
   861 F.3d 174 (D.C. Cir. 2017) ........................................................................... 11

*Ctr. for Envtl. Sci., Accuracy & Reliability v. DOI,*
   No. CV 17-2313 (JDB), 2019 WL 2870131 (D.D.C. July 3, 2019) ................................. 24, 25

*Ctr. for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018) ........................................................... 14, 17, 19

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006)...................................................................................... 28

*Dorsey v. Jacobson Holman PLLC,*
   764 F.Supp.2d 209 (D.D.C. 2011) ...................................................................... 26

*Edmond v. United States*,
    520 U.S. 651 (1997) ........................................................................... 41

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*,
    928 F.3d 95, 100 (D.C. Cir. 2019) ................................................... 22

*Envt'l. Working Grp. v. FDA*,
    301 F. Supp. 3d 165 (D.D.C. 2018) ................................................ 18

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ....................................................... 10

*FEC v. Akins*,
    524 U.S. 11 (1998) ............................................................... 14, 29, 31

*FiberLight, LLC v. Nat'l R.R. Passenger Corp.*,
    81 F. Supp. 3d 93 (D.D.C. 2015) ..................................................... 21

*Firearms Policy Coal., Inc. v. Barr*,
    419 F. Supp. 3d 118 (D.D.C. 2019) ................................................ 27

*Fleming v. Mohawk Wrecking & Lumber Co.*,
    331 U.S. 111 (1947) ......................................................................... 30

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ........................................... 13, 15, 17, 18

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ......................................................................... 12

*Friends of Animals v. Jewell*,
    115 F. Supp. 3d 107 (D.D.C. 2015) ................................................ 20

*Fund Democracy, LLC v. SEC*,
    278 F.3d 21 (D.C. Cir. 2002) ............................................... 23, 24, 25

*Gettman v. DEA*,
    290 F.3d 430 (D.C. Cir. 2002) ......................................................... 23

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ..................................................................... 28

*Goodman v. FCC*,
    182 F.3d 987 (D.C. Cir. 1999) ......................................................... 21

*Guedes v. ATF*,
    356 F. Supp. 3d 109 (D.D.C. 2019) ................................................ 42

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019), *cert denied*, 140 S. Ct. 789 (2020) ................................. 11, 32, 42

*Guedes v. ATF*, No. 19-5304,
   2020 WL 6580046 (D.C. Cir. Oct. 30, 2020) ........................................................... 27

*Hammer v. Ashcroft*,
   512 F.3d 961 (7th Cir. 2008), *reh'g en banc granted, opinion vacated on other grounds* (Aug.
   19, 2008), *on reh'g en banc,* 570 F.3d 798 (7th Cir. 2009) ....................................... 29

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................. 14

*Hunt v. Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................. 24

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ..................................................................... 25

*Intervet, Inc. v. Merial, Ltd.*,
   535 F. Supp. 2d 112 (D.D.C. 2008) ................................................................ 26

*Int'l Acad. of Oral Med. & Toxicology v. FDA*,
   195 F. Supp. 3d 243 (D.D.C. 2016) ................................................................ 18

*Jimenez Verastegui v. Wolf*,
   No. CV 18-2358 (TJK), 2020 WL 3297230 n.3 (D.D.C. June 18, 2020) ............................ 43

*L.M.-M. v. Cuccinelli*,
   442 F. Supp. 3d 1 (D.D.C. 2020) ............................................................... 32, 33

*Landry v. FDIC*,
   204 F.3d 1125 (D.C. Cir. 2000) .................................................................... 11

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................. 28

*Loma Linda Univ. v. Schweiker*,
   705 F.2d 1123 (9th Cir. 1983) ..................................................................... 30

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ............................................................................... 3

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 8, 9, 11

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .................................................................................. 8

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
　264 F. Supp. 3d 116 (D.D.C. 2017) ....................................................................... 44

*Mobley v. C.I.A.*,
　806 F.3d 568 (D.C. Cir. 2015) .............................................................................. 30

*Nat'l Taxpayers Union, Inc. v. United States*,
　68 F.3d 1428 (D.C. Cir. 1995) .............................................................................. 19

*NBC-USA Hous., Inc., Twenty-Six v. Donovan*,
　674 F.3d 869 (D.C. Cir. 2012) .............................................................................. 29

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv*.,
　208 F. Supp. 3d 142 (D.D.C. 2016) ....................................................................... 25

*NLRB v. SW Gen., Inc.*,
　137 S. Ct. 929 (2017) ................................................................................... 4, 5, 6, 7

*Nw. Immigrants Rts. Project v. USCIS*, No. 19-cv-3283 (RDM),
　2020 WL 5995206 (D.D.C. Oct. 8, 2020) ............................................. 33, 35, 37, 39

*Page v. Shelby*,
　995 F. Supp. 23 (D.D.C. 1998) .............................................................................. 22

*Penkoski v. Bowser*,
　No. 20-CV-01519 (TNM), 2020 WL 4923620 (D.D.C. Aug. 21, 2020)................................ 25

*PETA v. USDA*,
　797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 16, 19

*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
　878 F.3d 371 (D.C. Cir. 2017) .......................................................................... 13, 18

*Raines v. Byrd*,
　521 U.S. 811 (1997).............................................................................................. 12

*Rop v. Fed. Housing Fin. Agency*,
　No. 1:17-CV-497, 2020 WL 5361991 (W.D. Mich. Sept. 8, 2020) ......................... 40

*Schaghticoke Tribal Nation v. Kempthorne*,
　587 F. Supp. 2d 389 (D. Conn. 2008), *aff'd*, 587 F.3d 132 (2d Cir. 2009) ...................... 34, 41

*Schonberg v. FEC*,
　792 F. Supp. 2d 20 (D.D.C. 2011) ........................................................................ 10

*Seila Law LLC v. CFPB*,
　140 S. Ct. 2183 (2020)......................................................................................... 12

vi

*Sierra Club v. EPA*,
 292 F.3d 895 (D.C. Cir. 2002) ................................................................. 19, 20, 22

*Sierra Club v. Morton*,
 405 U.S. 727 (1972) ......................................................................................... 14

*Stand Up for California! v. DOI*,
 298 F. Supp. 3d 136 (D.D.C. 2018) .......................................................... passim

*Swanson Grp. Mfg. LLC v. Jewell*,
 790 F.3d 235 (D.C. Cir. 2015) ........................................................................... 8

*Tara Enterprises, Inc. v. Humble*,
 622 F.2d 400 (8th Cir. 1980) ........................................................................... 29

*Twin Rivers Paper Co. LLC v. SEC*,
 934 F.3d 607 (D.C. Cir. 2019) .................................................................... 10, 26

*U.S. Office of Special Counsel*,
 No. CV 19-3757 (JEB), 2020 WL 4530647 (D.D.C. Aug. 6, 2020) ....................... 10

*U.S. Telecom Ass'n v. FCC*,
 359 F.3d 554 (D.C. Cir. 2004) ......................................................................... 30

*United States v. Harris Cty.*,
 No. 4:16-CV-2331, 2017 WL 7692396 n.5 (S.D. Tex. Apr. 26, 2017) ............. 32, 35

*United States v. Hartwell*,
 73 U.S. (6 Wall) 386 (1867) ............................................................................. 38

*UtahAmerican Energy, Inc. v. DOL*,
 685 F.3d 1118 (D.C. Cir. 2012) ....................................................................... 26

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
 454 U.S. 464 (1982) ......................................................................................... 12

*Walker v. Cheney*,
 230 F. Supp. 2d 51 (D.D.C. 2002) .................................................................... 12

*Wash. Legal Found. v. Leavitt*,
 477 F. Supp. 2d 202 (D.D.C. 2007) .................................................................. 23

*Watson v. Mukasey*,
 589 F. Supp. 2d 43 (D.D.C. 2008) .................................................................... 21

## STATUTES

5 U.S.C. § 3345(a)(1)-(3) ....................................................................................... 37

5 U.S.C. § 3346 ............................................................................................ 4, 38, 39

5 U.S.C. § 3347 ................................................................................................. 31, 36

5 U.S.C. § 3348(b) .............................................................................. 5, 31, 34, 36

5 U.S.C. § 3349a(b) .................................................................................................. 39

5 U.S.C. §§ 3345-3349d .......................................................................................... 4

43 U.S.C. § 1451 .............................................................................................. 3, 41

43 U.S.C. § 1457 ....................................................................................................... 3

54 U.S.C. § 100302(a)(1) ...................................................................................... 2

Pub. L. No. 94-579 ................................................................................................... 2

## REGULATIONS

28 C.F.R. Pt. 0, App'x to Subpt. R § 12 ......................................................... 30

28 C.F.R. § 0.15(a) ................................................................................................ 30

36 C.F.R. § 51.25 .................................................................................................... 36

49 C.F.R. § 1.23 ...................................................................................................... 30

49 C.F.R. § 1502.1 ................................................................................................. 30

## RULES

Fed. R. Civ. P. 56 .................................................................................................... 8

## OUNITED STATES CONSTITUTION

U.S. Const. art. II ................................................................................................... 42

## OTHER AUTHORITIES

*Federal Vacancies Reform Act of 1998 – Assistant Attorney General for the Office of Legal Counsel, U.S. Department of Justice,*
   B-310780 (GAO June 13, 2008) ............................................................. 29, 31, 35

*Guidance on Application of Federal Vacancies Reform Act of 1998,*
   23 Op. O.L.C. 60, 72 (1999) .......................................................... 4, 29, 31, 33

S. Rep. No. 105-250 (1998) ................................................................................. *passim*

*Under Secretary for the Treasury for Enforcement*,
26 Op. O.L.C. 230 (2002).....................................................................................................33,34

**INTRODUCTION**

Plaintiffs admit that this lawsuit does not seek to set aside any particular action taken by Defendants.  Rather, they concede that they have brought this suit solely to "vindicate" the Appointments Clause and the Federal Vacancies Reform Act ("FVRA").  But a plaintiff's demand that the Government act in accordance with her view of the law does not state an Article III case or controversy.  Here, Plaintiffs have put forward no facts demonstrating that they meet the D.C. Circuit's requirements for either organizational or associational standing—Plaintiffs show no concrete harm to their own interests as organizations; no diversion of resources beyond lobbying and litigation expenditures, which are inadequate for the purpose of organizational standing; and no concrete harm to their individual members (if they even have such members).  Plaintiffs therefore lack standing to sue in any capacity.  Moreover, their broad and open-ended request for relief far outstrips the jurisdictional boundaries of Article III, and this Court thus lacks the remedial power to provide Plaintiffs the relief they seek to remedy alleged generalized grievances about the operation of NPS and BLM.

Even if the Court could reach the merits of Plaintiffs' claims, they still would not be entitled to summary judgment on their claims against NPS.  Plaintiffs' principal theory is that the Secretary of the Interior's delegation of the lawfully delegable duties of the Director of NPS to Department official Margaret Everson violates the Constitution's Appointments Clause because Ms. Everson would not satisfy the FVRA's criteria for service as Acting Director.  But Ms. Everson is not, and has never purported to be, the Acting Director.  Rather, she has been delegated the non-exclusive duties of the Director.  There is nothing unlawful about that.  The Appointments Clause does not prohibit agencies from delegating the duties of Senate-confirmed officers; far from it, in fact— such delegations routinely occur within the Government.  Moreover, the FVRA itself provides that even in circumstances in which the statute does not authorize anyone to serve as an *acting official*,

1

an agency may still *delegate* duties to other officers or employees. That understanding of the FVRA finds confirmation not only in the statutory text, but also in the legislative history of the FVRA, this Court's opinions, the consistent view of the Executive Branch since the FVRA's very inception, and the view of the Government Accountability Office.

The Secretary's delegation of authority to Ms. Everson violates neither the Appointments Clause nor the FVRA, and thus would pass constitutional muster even if this Court had jurisdiction. Accordingly, the Court should deny Plaintiffs' motion for summary judgment and dismiss this case in its entirety.

## STATUTORY AND REGULATORY FRAMEWORK

### A.   The Bureau of Land Management and the National Park Service.

BLM is a component of the U.S. Department of the Interior and serves as custodian of the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. Congress has tasked BLM with a mandate of managing public lands for a variety of uses such as energy development, livestock grazing, recreation, and timber harvesting while ensuring natural, cultural, and historic resources are maintained for present and future use. See generally Federal Land Policy and Management Act, Pub. L. No. 94-579, 90 Stat. 2743 (1976) (codified at 43 U.S.C., Ch. 35).

NPS is a component of the U.S. Department of the Interior responsible for the promotion and regulation of the National Park System. Congress provided for a Director to be the head of NPS and to be appointed "by the President, by and with the advice and consent of the Senate." 54 U.S.C. § 100302(a)(1). The Director is charged with the "supervision, management, and control" of the National Park System. *Id.* § 100302(a)(3). Congress provided for two Deputy Directors, one responsible for NPS operations and the other responsible for other NPS programs, *id.* § 100302(b), and NPS created a third Deputy Director position in 2016, responsible for

2

management and administration, *see* Declaration of Maureen Danaher Foster ¶ 5 ("Foster Decl.").

The Secretary of the Interior is the head of the Department.  43 U.S.C. § 1451.  Congress has vested all of the functions of the officers, agencies, and employees of the Department in the Secretary.  Reorganization Plan No. 3 of 1950 § 1.  The Secretary is specifically charged with "the supervision of public business relating to" NPS.  43 U.S.C. § 1457.  Congress has also granted the Secretary broad authority to delegate the performance of "any function of the Secretary" to "any other officer, or by an agency or employee, of the Department of the Interior."  Reorganization Plan No. 3 of 1950 § 2.  Under this authority, the Secretary has delegated, through the Assistant Secretary for Fish and Wildlife and Parks, specific authorities to the Director of NPS.  *See* 245 Department of the Interior Departmental Manual Pt. 245 Ch. 1 § 1.1 [hereinafter "DM"] (attached as Foster Decl., Ex. 1).  In addition, the Departmental Manual provides that the authority of a vacant office subject to Senate confirmation shall be delegated to the officials within the Department specifically designated for that purpose by statute and/or the appropriate Departmental component or officer.  302 DM Ch. 2 § 2.5 (attached as Foster Decl. Ex. 2).

**B.     The Federal Vacancies Reform Act.**

The Appointments Clause of the U.S. Constitution prescribes the method of appointment for all "Officers of the United States" whose appointments are not otherwise provided for in the Constitution.  *See Buckley v. Valeo*, 424 U.S. 1, 125-26, 132 (1976) (per curiam).  "Officers" are those persons who hold a "continuing and permanent" federal position and exercise "significant authority pursuant to the laws of the United States."  *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citation omitted).  The President, with the advice and consent of the Senate, nominates and appoints principal officers.  Congress may vest the power to select "inferior Officers," however, "in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art.

3

II, § 2, cl. 2.   Neither the Appointments Clause nor any other provision of the Constitution expressly addresses whether, or in what circumstances, an individual may serve temporarily as an acting officer or whether and in what circumstances the authority vested in an officer can be delegated to other officials.

Since 1792, Congress has provided for the designation of non-confirmed persons to serve temporarily as acting officers.  *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 934 (2017).  In 1998, Congress enacted the FVRA, 5 U.S.C. §§ 3345-3349d.  The FVRA provides three means by which an acting official can perform the duties of a vacant office that is subject to Senate confirmation (or "PAS" office).  First, as a default, the "first assistant" to the vacant office shall perform its functions and duties.  *Id.* § 3345(a)(1).  Second, the President may designate another PAS officer. *Id.* § 3345(a)(2).  Third, the President may designate an officer or employee within the agency, provided that she has satisfies certain tenure and compensation requirements.  *Id.* § 3345(a)(3). For certain offices, Congress has defined which officer is the first assistant for purposes of the FVRA; however, in the absence of a statutorily defined first assistant, it has long been understood that agencies may designate the first assistant to the office.  *See* S. Rep. No. 105-250, at 12 (1998).

The FVRA imposes time limits on acting officers serving under its provisions.  Generally, a vacancy may initially be filled by an acting officer for 210 days after the vacancy occurs, *see* 5 U.S.C. § 3346(a)(1), though vacancies that exist during a Presidential transition can be filled for a longer period, *see id.* § 3349(a)(b).  Notwithstanding that time limit, when a nomination has been submitted to the Senate, either for the first or second time, the FVRA permits an acting official to serve while that nomination is pending, *id.* § 3346(a)(2), and for 210 days after each nomination is rejected, withdrawn, or returned, *id.* § 3346(b)(1)-(2).  Once the 210-day period after the rejection, withdrawal, or return of the second nomination has lapsed, no acting official may serve

under the FVRA.

When an office has no validly serving acting officer, including when the FVRA's time limits have expired, the FVRA requires that it "remain vacant," *id.* § 3348(b)(1), and "only the head of such Executive agency may perform any function or duty of such office," *id.* § 3348(b)(2). Section 3348 narrowly defines a "function or duty" of a vacant office subject to this constraint to mean a "function or duty of the applicable office" that is "established by" statute or regulation and "required by statute" or "such regulation" "to be performed by the applicable officer (and *only* that officer)." *Id.* § 3348(a)(2)(A)-(B) (emphasis added).

## FACTUAL BACKGROUND

On January 3, 2017, the Senate-confirmed NPS Director, Jonathan B. Jarvis, resigned. Foster Decl. ¶ 8. The following day, Michael T. Reynolds, then-Deputy Director for Operations, began serving as Acting Director under the provision of the FVRA that authorizes first assistants to serve automatically in the event of a vacancy. *Id.* ¶ 8. The Deputy Director for Operations had been designated the first assistant to the office of the Director of NPS under a November 25, 2008 succession order ("November 2008 Order"), allowing Deputy Director Reynolds to be the Acting Director when service under the FVRA was permissible. *Id.* ¶ 8; *id.*, Ex. 3. That same order also identified a line of officials within NPS to whom the authority of the Director could be delegated, with the Deputy Director for Operations first in line. *Id.*, Ex. 3. Deputy Director Reynolds served in an acting capacity through August 1, 2017, *id.* ¶ 9, when he relinquished that designation. *Id.* ¶ 10. After August 1, 2017, he continued to perform the Director's lawfully delegable duties under the delegation provisions of the November 2008 Order. *Id.* ¶ 10.

The November 2008 Order contained no time limit on the delegation to the Deputy Director. *Id.*, Ex. 3. On September 1, 2017, however, then-Secretary of Interior Ryan Zinke issued Amendment 9 to Secretary's Order 3345, which delegated the non-exclusive functions or duties

of the Director—or "only those functions or duties that are not required by statute or regulation to be performed only by the Senate-confirmed official occupying the position"—to Deputy Director Reynolds with an October 31, 2017 expiration.  *Id.* ¶ 11; *id.*, Ex. 4.

That delegation order was later amended multiple times, by former Secretary Zinke and by current Secretary David Bernhardt, each time re-delegating the Director's non-exclusive duties to a particular individual.  *Id.* ¶ 12.  Between September 1, 2017 and June 5, 2020, three individuals exercised the non-exclusive functions or duties of the Director of NPS under a Secretarial delegation—Deputy Director Reynolds; P. Daniel Smith, then-Deputy Director for Congressional and External Relations; and Raymond David Vela, then-Deputy Director for Operations.  *Id.*

Specifically, Deputy Director Vela was delegated the non-exclusive authority of the Director under amendments to Secretary's Order 3345 between September 30, 2019 and June 5, 2020.  *Id.* ¶ 13; *id.*, Ex. 5.  On June 4, 2020, Deputy Director Vela, exercising the delegated authority of the Director, submitted a new succession memorandum for the NPS Director to George Wallace, the Assistant Secretary for Fish and Wildlife and Parks.  *Id.* ¶ 14; *id.*, Ex. 6.  The Assistant Secretary approved the memorandum that day.  *Id*, Ex. 6.  As with the November 2008 Order, the new memorandum listed the Deputy Director for Operations in the first position to exercise the non-exclusive duties of the NPS Director.  *Id.* ¶ 14; *id.*, Ex. 6.  Upon expiration of Secretary's Order 3345 on June 5, 2020, Deputy Director Vela was re-delegated the non-exclusive authority of the Director through this new succession memorandum, until August 10, 2020.  *Id.* ¶ 16.  Deputy Director Vela retired from NPS on August 29, 2020.  *Id.* ¶ 18.

On August 10, 2020, Secretary Bernhardt issued Secretary's Order 3381, which delegated the non-exclusive functions or duties of the Director to Margaret Everson, Counselor to the Secretary.  *Id.* ¶ 17; *id.* Ex. 7.  By its terms, the delegation terminates upon either the confirmation

of a new Director or the designation of an Acting Director under the FVRA. *Id.*, Ex. 7. Under this Order, Ms. Everson has performed the delegated, non-exclusive duties of the Director since August 10, 2020. *Id.* ¶ 17.

## PROCEDURAL BACKGROUND

Plaintiffs—Public Employees for Environmental Responsibility ("PEER") and Western Watershed Project ("WWP")—are two non-profit organizations whose missions broadly concern the management and use of public lands in the United States. Plaintiffs brought suit on May 11, 2020. *See* Compl., ECF No. 1. Since then, Plaintiffs have twice supplemented their complaint: first, on July 2, 2020, before Defendants' deadline to respond to the original Complaint, *see* Suppl. Compl., ECF No. 7, and second, on August 26, 2020. The second supplemental complaint ("SSC") asserts four claims related to the delegations of the non-exclusive duties of the Director of NPS to Deputy Director Vela and Ms. Everson and to delegations of the non-exclusive duties of the Director of BLM to BLM's Deputy Director for Policy and Programs, William Pendley. *See* Second Suppl. Compl., ECF No. 11.

Defendants moved to dismiss the SSC on the grounds that Plaintiffs had failed to allege sufficient facts to demonstrate Article III standing. *See* Defs.' Mot. to Dismiss, ECF No. 13 ("Defs.' Mot."). Before briefing on that motion was complete, Plaintiffs moved for partial summary judgment on their NPS-related claims. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss & Mot. for Partial Summ. J. 5, ECF No. 24 ("Pls.' Mem."). Count One challenges Secretary Bernhardt's May 5, 2020 amendment to Secretary's Order 3345, which re-delegated the non-exclusive duties of the NPS Director to Deputy Director Vela between May 5, 2020 and June 5, 2020. *See* Second Suppl. Compl. ¶¶ 38-40. Count Two challenges both a June 5, 2020 order issued by Deputy Director Vela designating officials who may be delegated the authority of the NPS Director, as well as Secretary Bernhardt's Order 3381, which delegated authority to Ms. Everson. *Id.* ¶¶ 43-

45. Nevertheless, Mr. Vela is not named as a Defendant in the SSC.

Plaintiffs seek broad relief that would (i) declare invalid the past delegations of authority to Deputy Director Vela from May 5, 2020 onwards; (ii) declare invalid the delegation of authority to Ms. Everson; and (iii) "[e]njoin any future actions . . . in violation of the APA[] [and] FVRA." *Id.* at pp. 16-17 (prayer for relief).[1]

## SUMMARY JUDGMENT STANDARD OF REVIEW

To prevail at summary judgment, Plaintiffs bear the burden of establishing that they have Article III standing to challenge the authority of Ms. Everson (or the past authority of Deputy Director Vela) to perform the non-exclusive duties of the office of the Director. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239 (D.C. Cir. 2015). At the summary judgment stage, Plaintiffs cannot rely on "general factual allegations of injury resulting from the defendant's conduct," but must instead "set forth by affidavit or other evidence specific facts," establishing their claim to Article III standing. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (alterations omitted). A court may "not 'presume the missing facts' necessary to establish an element of standing." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

On the merits, Plaintiffs bear the burden of showing that there are no genuine issues of material fact and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must view the evidence and draw all justifiable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

---

[1] Plaintiffs' SSC seeks further relief against Defendants Pendley and BLM. *See* Second Suppl. Compl. pp. 16-17 (prayer for relief). However, whereas Defendants' motion to dismiss seeks to dismiss Plaintiffs' entire complaint, Plaintiffs' parallel partial motion for summary judgment seeks relief solely on those claims related to Defendants Everson and NPS.

Plaintiffs are not entitled to summary judgment—and their claims should be dismissed—because they lack standing. They challenge no actual action of BLM or NPS, let alone one taken by Mr. Pendley or Ms. Everson (or Deputy Director Vela), and their conclusory assertions of "impacts" and "harms" cannot meet the D.C. Circuit's established standards for demonstrating organizational or associational standing. This Court lacks jurisdiction to adjudicate what amounts to a generalized grievance about the manner in which Defendants operate. But even on the merits, Plaintiffs' NPS-related claims fail because neither the Appointments Clause nor the FVRA bars an agency from delegating non-exclusive duties of a vacant PAS office.

## I.   PLAINTIFFS HAVE FAILED TO ESTABLISH STANDING.

Plaintiffs allege that Mr. Pendley and Ms. Everson unlawfully exercise the non-exclusive duties of the BLM and NPS Directorships, respectively. But Plaintiffs nowhere plead or explain how Defendants' allegedly improper service has injured them or their individual members. By their own admission, Plaintiffs' case is not about the hodgepodge of acts vaguely described in their declarations, but rather an effort to broadly "vindicate" the Appointments Clause, the separation of powers, and the FVRA. Pls.' Mem. 8 (emphasis added). No matter how sincere Plaintiffs' concern, a complaint that merely seeks to vindicate the "proper application of the Constitution and laws" does "not state an Article III case or controversy." *Lujan*, 504 U.S. at 573 (1992); *see also Allen v. Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."); *Carney v. Adams*, --- S. Ct. ----, 2020 WL 7250101, at *3 (U.S. Dec. 10, 2020) ("[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'"). Plaintiffs' generalized grievances fail to provide the standing necessary to invoke this

Court's Article III jurisdiction. Their broad and prospective requests for relief reflect this, straying far beyond their few vague claims of injury. Accordingly, for the reasons set out in support of Defendants' motion to dismiss, the Court should deny Plaintiffs' request for partial summary judgment and dismiss the case in its entirety for lack of jurisdiction.

### A. Plaintiffs Are Not Entitled to a Lower Bar For Standing and Must Establish a Concrete Injury-in-Fact to Meet the Constitutional Standing Requirement.

Plaintiffs, as organizations, "can satisfy Article III standing in one of two ways." *Citizens for Responsibility & Ethics in Wash. v. U.S. Office of Special Counsel*, No. CV 19-3757 (JEB), 2020 WL 4530647, at *5 (D.D.C. Aug. 6, 2020). "They can sue either on their own behalf ('organizational standing') or on behalf of their members ('representational standing')." *Id.* (citing *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006)). Both approaches require Plaintiffs to demonstrate a concrete injury-in-fact to invoke the Court's jurisdiction. *See Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (organizational standing requires concrete injury-in-fact); *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612 (D.C. Cir. 2019) (representational standing requires concrete injury-in-fact). Demonstrating standing is "an essential and unchanging predicate" even where Plaintiffs' claims are constitutional in nature. *Schonberg v. FEC*, 792 F. Supp. 2d 20, 24 (D.D.C. 2011) ("In order for a plaintiff to establish standing to bring a constitutional claim, Article III requires the plaintiff to show an injury in fact, that the conduct complained of caused the injury, and that it is likely, and not merely speculative, that the relief the plaintiff seeks would redress the injury.").

Instead of identifying a concrete injury-in-fact, Plaintiffs' primary tack is to downplay the well-established requirements for standing. *See* Pls.' Mem. 7-9 (claiming this case "does not present the standard administrative review standing debates" and that "Plaintiffs' standing burden is light here"). But Plaintiffs fail to lessen their burden to establish standing.

The D.C. Circuit's decision in *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000), does not relieve Plaintiffs of meeting the "irreducible constitutional minimum" of establishing an "injury in fact." *Lujan*, 504 U.S. at 560. In *Landry*, the petitioner challenged the appointment of an Administrative Law Judge ("ALJ") whose adverse decision against the petitioner was upheld by the FDIC's Board of Directors. *See Landry*, 204 F.3d at 1128. The FDIC argued that Landry could not show a causal link between his injury and the ALJ's decision for standing purposes because the Board of Directors upheld the decision under *de novo* review. *Id.* at 1130. The D.C. Circuit recognized the "special problem" of allowing the ALJ's appointment to escape challenge through the Board of Directors' review, and thus allowed for a more attenuated causal link between the challenged action and Landry's injury. *Id.* at 1132; *see also Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019) (recognizing that *Landry* "carved out a narrow exception" based on the "catch-22" presented in cases involving "purely decision recommending employees"), *cert denied*, 140 S. Ct. 789 (2020). But *Landry* has no relevance here because, as explained *infra*, Plaintiffs have failed to identify *any* concrete and particularized injury-in-fact, whereas Landry alleged harm stemming from an ALJ's decision.[2]

The Supreme Court's decision in *Free Enterprise Fund* is also unhelpful to Plaintiffs. *See* Pls.' Mem. 8-9. That decision concluded that the improper appointment of members of the Public Company Accounting Oversight Board warranted "declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which" the challengers were subject were enforced by constitutionally appointed officers, but otherwise *denied* the very kind of "broad

---

[2] Plaintiffs' claim that "relaxed redressability" rules apply to their procedural injuries (Pls.' Mem. 15) is similarly irrelevant—redressability only matters once a concrete injury-in-fact has been alleged, and Plaintiffs have not done so here. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) (in procedural rights cases, "the injury in fact requirement is a hard floor of Article III jurisdiction that cannot be altered").

injunctive relief" that Plaintiffs seek here.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) (concluding "petitioners are not entitled to broad injunctive relief against the Board's continued operations").  Plaintiffs point to no similar policies in this case.[3]

Contrary to Plaintiffs' arguments, the Court's standing inquiry "must be 'especially rigorous'" where, as here, "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 763 (D.C. Cir. 2020) (en banc) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-820 (1997)). Such rigorous inquiry ensures proper deference to the coordinate branches of government.  *See Walker v. Cheney*, 230 F. Supp. 2d 51, 65 (D.D.C. 2002) (explaining why separation of powers compels courts to apply "especially rigorous" standing inquiry in such cases (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982); *Blair v. United States*, 250 U.S. 273, 279 (1919))).

Plaintiffs' claims are not entitled to a lower standing bar—like all other claims, they must comply with constitutionally mandated requirements for standing to invoke this Court's jurisdiction.  Plaintiffs' standing arguments fail to meet these requirements under even cursory review—never mind the "especially rigorous" review appropriate here.

**B.  Plaintiffs Have Not Demonstrated Organizational Standing.**

---

[3] For that same reason, *Seila Law LLC* and *Collins* (Pls.' Mem. at 9) do not help Plaintiffs.  In both cases the plaintiffs adequately alleged that *specific* acts caused them *concrete* injuries-in-fact.  *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) ("But petitioner's appellate standing is beyond dispute. Petitioner is compelled to comply with the civil investigative demand and to provide documents it would prefer to withhold, a concrete injury."); *Collins v. Mnuchin*, 938 F.3d 553, 586 (5th Cir. 2019) (concluding plaintiffs "suffered injury in fact"), *cert. granted*, No. 19-422, 2020 WL 3865248 (U.S. July 9, 2020), *and cert. granted*, No. 19-563, 2020 WL 3865249 (U.S. July 9, 2020).

To demonstrate standing to sue in their organizational capacities, Plaintiffs "must show [both] that the defendant[s'] action or omission to act injured the organization[s'] interest" *and* "that [the organization] used its resources to counteract that harm." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (citations omitted). But Plaintiffs and their declarants make only the sparest allegations that they have been harmed by Ms. Everson's or Mr. Pendley's ongoing service, and Plaintiffs fail altogether to show that they have diverted resources to counteract any alleged harm. *See* Defs.' Mem. 9-14.

### 1.   *Plaintiffs Do Not Allege Harm to Their Services or Operations.*

Showing organizational injury requires Plaintiffs to allege "that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Perceptible impairment occurs when the challenged conduct causes an actual "inhibition of [the organization's] daily operations." *Id.* (citation omitted). "The [D.C. Circuit] has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised[,]" requiring a showing of actual impediment. *Abigail All.*, 469 F.3d at 133.

Plaintiffs' organizational injury claims effectively fall into two categories. First, the SSC and Plaintiffs' declarants claim a generalized interest in having the non-delegable duties of the Directors of BLM and NPS exercised by Senate-confirmed officers and argue that Mr. Pendley's and Ms. Everson's continued service harms that interest. Second, Plaintiffs and their declarants allude to various actions taken by BLM and NPS that have "impacted" Plaintiffs in some manner. Neither category of alleged harm "perceptibly impair[s] the organization[s'] ability to provide services," "inhibit[s]" PEER or WWP's "daily operations," or otherwise "impede[s]" Plaintiffs'

13

organizational tasks as required to show an organizational injury. *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 37 (D.D.C. 2018) (citation omitted); *see also* Defs.' Mot. 4-8.

　　With respect to the first category of harm, Plaintiffs claim that:

- They were "denied the opportunity to submit evidence and testimony into a confirmation record for Mr. Pendley and Ms. Everson," Second Suppl. Compl. ¶ 26;

- They are harmed by Mr. Pendley and Ms. Everson actively performing the duties and functions of the BLM and NPS Directors, respectively, *id.* ¶¶ 27, 29; *see also* Declaration of Timothy Whitehouse, ECF No. 24-7 ¶¶ 4-6, 8 ("Whitehouse Decl."); Declaration of Erik Molvar, ECF No. 24-8 ¶¶ 4-7, 9 ("Molvar Decl.");

- PEER and its supporters have an interest in NPS and BLM employees "serv[ing] under a properly Senate-confirmed or otherwise FVRA-complaint Director" and further in resolving the "reasonable fear of arbitrary re-assignment[] and transfer[]" of NPS and BLM employees by Defendants, Second Suppl. Compl. ¶¶ 30-31; *see also* Whitehouse Decl. ¶¶ 4-6, 8; Molvar Decl. ¶¶ 4-7, 9;

- PEER is "harmed by Ms. Everson illegitimately participating" in an *ex-officio* role on the Board of Directors of the National Park Foundation, *see* Whitehouse Decl. ¶ 10; and

- "WWP has a strong interest in the legitimacy of the leaders of these agencies, which are two of the nation's largest public land managers," Second Suppl. Compl. ¶ 32; *see also* Molvar Decl. ¶ 7.

Each of these claimed harms amounts to nothing more than a generalized complaint that the law is not being obeyed. *See FEC v. Akins*, 524 U.S. 11, 24 (1998) ("injury to the interest in seeing that the law is obeyed" too abstract and non-specific for standing). None amounts to a "concrete and demonstrable injury to [either] organization's activities" as compared to "simply a setback to the organization's abstract social interests." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). And harm to such abstract interests does not confer standing under Article III. *Id.* at 24 ("[A]n organization's abstract interest in a problem is insufficient to establish standing, 'no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem.'" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972))).

Beyond these generalized claims of abstract harm, Plaintiffs' operative complaint alleges only that their organizations were "impacted" by unspecified COVID-19-based closures of NPS and BLM lands, and also by unspecified *refusals* to close BLM and NPS lands. *See* Second Suppl. Compl. ¶¶ 29, 31, 33; *see also* Whitehouse Decl. ¶¶ 5, 8; Molvar Decl. ¶¶ 5, 7. Setting aside the contradictory nature of these allegations, Plaintiffs fail to identify *which* lands they are referring to or *how* their closure (or refusal to close) impedes Plaintiffs' organizational operations.[4] Plaintiffs' complaint therefore fails to allege *any* conduct that "perceptibly impaired the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919.

Perhaps recognizing the deficiencies in their SSC, Plaintiffs now present several "standing declarations" that purport to show harm to their organizations. But none of the allegations in these declarations plausibly alleges that WWP's or PEER's daily operations have been impaired by Defendants. PEER, through the declaration of its Executive Director Timothy Whitehouse, claims its operations were impaired by BLM's decision to move its headquarters from Washington, D.C. to Grand Junction, Colorado, and also by BLM's refusal to provide a full response to a FOIA request filed by PEER, ultimately resulting in litigation. *See* Whitehouse Decl. ¶¶ 5, 6. Mr. Whitehouse claims that the decision to relocate BLM's headquarters limited PEER's "ability to influence the agency." *Id.* ¶ 5(B). Even accepting this claim as true—and setting aside the fact that many organizations around the country routinely lobby and engage with institutions in Washington, D.C.—a diminished ability to lobby does not constitute an organizational injury. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, No. 19-CV-02898 (APM), 2020 WL 5702087, at

---

[4] Plaintiffs' COVID-19-related allegations of harm are not remedied by their new "standing declarations." While Mr. Whitehouse and Mr. Molvar claim these decisions have "impacted" PEER and WWP supporters and members who are BLM employees, neither explains *how* such decisions have "impacted" their supporters or members, never mind how these decisions harmed PEER or WWP's daily operations or services. *See* Whitehouse Decl. ¶ 5(C); Molvar Decl. ¶ 5(F).

15

*5 (D.D.C. Sept. 24, 2020) (collecting cases and holding that "advocacy and lobbying efforts . . . have long been considered insufficient to establish a cognizable organizational injury").

Similarly, PEER's decision to pursue litigation against BLM in support of its FOIA request does not constitute an allegation that PEER's daily operations or services were impeded. *See* Pls.' Mem. 10. At most, it shows that PEER expended time and resources, but it is well-established that "an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). Further still, Mr. Whitehouse does not allege or suggest that the FOIA dispute was in any way related to Mr. Pendley. PEER's decision to pursue litigation against the agency cannot provide an injury-in-fact here.

As to Ms. Everson, Mr. Whitehouse claims that PEER is "impact[ed]" by NPS's continued implementation of a new electric bicycle policy in national parks. *See* Whitehouse Decl. ¶ 9. But PEER nowhere explains what "impact" the policy has on PEER *as an organization* or how it impedes PEER's operations.[5]

WWP's allegations, made through its Executive Director Erik Molvar, fare no better. With respect to Mr. Pendley, Mr. Molvar claims that WWP was harmed by the BLM Uncompahgre Field Office in Colorado approving a Resource Management Plan over the formal protest of WPP, and also by BLM's mismanagement of pinyon-juniper woodlands. *See* Molvar Decl. ¶¶ 5(D)-(E); *see also* Pls.' Mem. 11-13. While WWP may have sincere concerns with these policies, it fails to

_____

[5] Mr. Whitehouse also claims that the electric bicycles policy was issued "by fiat of former Deputy Directors Vela and P. Daniel Smith" and that Ms. Everson merely "continu[ed] with the implementation" of the policy. Whitehouse Decl. ¶ 9. PEER therefore concedes that this alleged harm is not even traceable to Ms. Everson's service.

explain how these decisions have perceptibly impeded the organization's daily operations.  *See Food & Water Watch*, 808 F.3d at 919.

WWP's reliance on the district court's decision in *Bullock v. BLM*, No. 4:20-CV-00062-BMM, 2020 WL 5746836, at *4 (D. Mont. Sept. 25, 2020), is misplaced.  *See* Pls.' Mem. 12, n.5.  The court in that case found that the Governor of Montana and the Montana Department of Natural Resources had standing to challenge specific BLM Resource Management Plans because Montana had "alleged an injury to it in its capacity of quasi-sovereign," and "[w]hen Montana acts in that capacity, it has an interest independent of and behind the titles of its citizens."  *Bullock*, 2020 WL 5746836, at *4 (citations omitted).[6]  The plaintiffs in *Bullock* did not purport to sue in an *organizational* capacity, and the district court there undertook no such standing analysis.  *Id.*  By contrast, PEER and WWP are not sovereign entities and are instead levying a collateral attack on Mr. Pendley's ongoing service, rather than any specific policy, as in *Bullock*.  That decision provides no basis for showing that PEER or WWP had their daily operations impeded by Mr. Pendley or Ms. Everson.[7]

None of the vaguely described "impacts" alleged by Plaintiffs or their declarants constitutes the kind of harm that inhibits Plaintiffs' daily operations or otherwise impedes their operations.  *See Ctr. for Responsible Sci.*, 346 F. Supp. 3d at 37 (citation omitted).  And even if they did, Plaintiffs have failed to plead specific facts establishing that these impacts give rise to

---

[6] While *Bullock* is not helpful to Plaintiffs here, Defendants nonetheless maintain that the district court erred in finding standing.

[7] Mr. Molvar does not raise any additional claims of harm to WWP attributable to Ms. Everson beyond those decisions related to COVID-19, addressed *supra* at 15.  *See* Pls.' Mem. 13.  Mr. Molvar otherwise only offers generalized grievances about Ms. Everson's service, such as her continued "supervising the hiring, promoting, and transfers of numerous Park superintendents and lower staff and directing the expenditures of millions of appropriated dollars."  Molvar Decl. ¶ 7.  But as explained *supra* at 14-15, such abstract complaints do not give rise to organizational standing.

standing.  *See Byrne v. Clinton*, 410 F. Supp. 3d 109, 118 (D.D.C. 2019) ("vague and conclusory claims" do not establish a concrete injury), *aff'd sub nom. Byrne v. Brock*, No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-412 (2013) (party invoking federal jurisdiction bears the burden of establishing standing and, at summary judgment, cannot rely on "mere allegations" but must set forth "specific facts").

> 2.    *Plaintiffs Have Not Shown That They Diverted Resources to Counter Harm to Their Daily Operations or Services.*

Plaintiffs cannot establish organizational standing for the additional reason that they have not demonstrated that they diverted resources in response to the alleged impediment of their operations and services.  *See Elec. Privacy Info. Ctr.*, 878 F.3d at 378 ("the plaintiff must show that it used its resources to counteract [] harm" to establish organizational standing (citation omitted)).  Plaintiffs do not meaningfully address this requirement in their briefing, instead only offering the bare claim that "PEER has expended significant organizational resources" to protect BLM and NPS employees and "to protect its own interest in having properly-appointed BLM and NPS Directors."  Pls.' Mem. 13.[8]

Regardless, the argument that Plaintiffs spent resources serving their members or supporters, or furthering their own mission through advocacy, does not show that Plaintiffs were forced to "*divert or modify* [their] activities in [a] meaningful way from [their] programmatic efforts."  *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 259 (D.D.C. 2016) (emphasis added).  Moreover, D.C. Circuit "precedent makes clear that an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury."  *Food & Water Watch*, 808 F.3d at 919; *see also Envt'l. Working Grp. v. FDA*, 301 F. Supp. 3d 165, 171 (D.D.C.

---

[8] Plaintiffs' Opposition fails to make even a similar barebones claim on behalf of WWP.

18

2018) ("It will not suffice if the plaintiff can only assert an injury that arises from the effect . . . on the organizations' lobbying activities" (citation omitted)).  Plaintiffs fail to show, and indeed do not even contend, that these expenses constitute a diversion of resources, and organizational standing is therefore lacking for this independent reason as well.  *Cf. Gottlieb*, 346 F. Supp. 3d at 40 (finding no organizational standing where plaintiff "allege[d] generally that it 'diverted its resources,'" because "[s]uch a conclusory statement cannot save the day" (citation omitted)).[9]

### C.  Plaintiffs Have Not Established Representational Standing on Behalf of Their Members.

Because Plaintiffs cannot show that they suffered injuries-in-fact in their organizational capacities, their only remaining avenue for standing is to establish that they may file suit in a representational, or associational, capacity on behalf of their members.  Doing so requires Plaintiffs to establish that: "(1) at least one of [their] members would have standing to sue in his own right, (2) the interests the association[s] seek[] to protect are germane to [their] purpose[s], and (3) neither the claim asserted nor the relief requested requires that an individual member of the association[s] participate in the lawsuit."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  The SSC fails to identify a single member in either organization who might meet these requirements, and Plaintiffs' belated declarations in opposition to Defendants' motion to dismiss fail to meet Plaintiffs' burden.

---

[9] Mr. Whitehouse's declaration could, read generously, be understood to claim that PEER has had to expend resources pursuing litigation against NPS's new electronic bicycles policy and against BLM in a FOIA action. *See* Whitehouse Decl. ¶¶ 4, 9.  But "an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing."  *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." (citation omitted)).

      1.     *Neither of WWP's Member-Declarants Establishes an Injury-in-Fact to Provide Standing to Sue.*

WWP submits two declarations from members Barbara J. Moritsch and Richard Kroger in support of its motion for summary judgment.  As to Mr. Pendley, Ms. Moritsch alleges that she "recreate[s] in Montana" and that this recreation will be harmed by unspecified "new plans" that BLM recently developed in Montana that "eliminate protection of areas of critical environmental concern and lands with unique wilderness characteristics, and make 95% percent of federal public land in Montana available for oil and gas development."  *See* Declaration of Barbara J. Moritsch, ECF No. 24-6 ¶ 6 ("Moritsch Decl.").  But Plaintiffs fail to explain *what* these new plans are, *when* they were adopted, *how* Mr. Pendley was involved in making them, or *why* they "will adversely affect the quality of BLM lands."  *Id*.  Ms. Moritsch's vague and conclusory complaints about BLM's "new plans" do not provide this Court a foundation for concluding that she has suffered an injury-in-fact.  *See Byrne*, 410 F. Supp. at 118 (finding standing lacking where "plaintiffs provide the Court only with vague and conclusory claims").  In fact, Plaintiffs do not offer *any* explanation as to how Ms. Moritsch's recreation will be harmed beyond her bare assertion that she "know[s]" the policies will be harmful to BLM lands.  *See* Moritsch Decl. ¶ 6.  Such a vague assertion of harm does not create standing.  *See Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 119 (D.D.C. 2015) (plaintiff group lacked standing where it vaguely alleged that its members "recreate near 'some' of the tortoise species in question," and it was "impossible to tell which species falls into (or out of) this 'some' category").

Ms. Moritsch offers only skeletal claims of harm concerning Ms. Everson's service.  She claims that the "instability and confusion generated by the revolving door series of leadership appointments has harmed many of [her] close friends who presently work for the NPS, and has harmed [her] personally as the park lands [she] love[s] are not getting the care they deserve and

require."  Moritsch Decl. ¶ 8.[10]  Ms. Moritsch further alleges that Ms. Everson lacks the qualifications and experience necessary to effectively perform the duties of NPS Director, and claims that various acts of mismanagement have harmed her and other park visitors.  *Id.* ¶¶ 9-11. But Ms. Moritsch, again, fails to offer any detail about how her enjoyment of park lands has suffered as a result of Ms. Everson's alleged leadership shortcomings or how alleged acts of mismanagement have harmed her specifically, as compared to the public at large.  Such generalized and conclusory claims of harm do not establish standing.  *See Watson v. Mukasey*, 589 F. Supp. 2d 43, 48 (D.D.C. 2008) ("It is . . . well established that a generalized grievance brought on behalf of the public at large is not sufficient to establish standing[.]"); *accord Carney*, --- S. Ct. ----, 2020 WL 7250101, at *4.

WWP's second member-declarant, Mr. Kroger, offers similarly insufficient allegations. He claims that the relocation of BLM headquarters will harm BLM's regular visitors, including him, whose influence will be outmatched by energy industry influence.  *See* Declaration of Richard Kroger, ECF No. 24-5 ¶ 7 ("Kroger Decl.").  He further alleges that mismanagement of BLM lands under Mr. Pendley has harmed his interest in keeping such lands healthy and beautiful.  *Id.* ¶ 9. But Plaintiffs again fail to explain how Mr. Kroger's broad dissatisfaction with Mr. Pendley harms *him* in a particularized manner.  While Mr. Kroger expresses concern that oil wells may displace sage grouse habitats, he neither explains what specific BLM actions will imminently cause such oil wells to be built or how sage grouse displacement impacts him.  *Id.*  The same is true of his

---

[10] Any harm allegedly experienced by Ms. Moritsch's unidentified *friends* does not give *her* standing to sue absent an attempt to plead third-party standing, which Plaintiffs fail to do here. *See, e.g.*, *Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999) (affirming dismissal for lack of third-party standing where plaintiff did not allege a close relationship to party-in-interest and that party was not hindered in asserting own rights); *FiberLight, LLC v. Nat'l R.R. Passenger Corp.*, 81 F. Supp. 3d 93, 111 (D.D.C. 2015) (same).

concern that BLM's grazing rules may result in over-utilization of vegetation, *id.*; Plaintiffs say nothing about how these grazing rules are traceable to Mr. Pendley, how they will affect wildlife, or how Mr. Kroger specifically will be injured.  WWP has therefore failed to show that either of its member-declarants has suffered an injury-in-fact that would allow them to sue in their own right.  *See Page v. Shelby*, 995 F. Supp. 23, 28 (D.D.C. 1998) (holding that allegations of "vague, conjectural and hypothetical harm . . . cannot confer standing"); *Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 312 (D.D.C. 2011) (holding that purported intervenors lacked standing because they "do not explain" how a feared "outcome would actually *harm* them"); *Sierra Club*, 292 F.3d at 898.[11]

        2.    *PEER's Declarants Are Not "Members" and Identify No Injury-in-Fact Sufficient for Standing to Sue.*

PEER also submits several declarations in support of its standing argument, including from (1) its Executive Director Timothy Whitehouse; (2) an anonymous GS-11 BLM employee ("John Doe A"); (3) an anonymous GS-13 scientist at NPS ("John Doe B"); and (4) Mr. Kroger, who in addition to being a member of WWP is also a "supporter" of PEER.  *See* Whitehouse Decl.; Declaration of John Doe A, ECF No. 24-3 ("Doe A. Decl."); Declaration of John Doe B, ECF No.

---

[11] Though Plaintiffs' opposition only references Ms. Moritsch and Mr. Kroger as potential WWP members with individual standing, the group's Executive Director, Mr. Molvar, makes one claim of individualized, rather than organizational, harm.  Specifically, he claims that management of BLM and NPS lands "has suffered in the absence of Senate-confirmed Directors or legally-compliant acting Directors during the Trump Administration" and that "this has harmed [his] enjoyment of these lands that [he] know[s] so well."  Molvar Decl. ¶ 8.  But Mr. Molvar identifies no specific act of alleged mismanagement of BLM or NPS lands causing this harm, let alone one performed by Mr. Pendley or Ms. Everson, and further offers no detail at all concerning how his "enjoyment" of the lands has been injured.  Such an abstract and unsubstantiated claim of harm fails to demonstrate the "concrete injury" required for WWP to sue on Mr. Molvar's behalf.  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 100 (D.C. Cir. 2019) (concluding an "assertion of associational standing . . . fails" where plaintiff "has not identified a concrete injury suffered by one of its members").

24-4 ("Doe B Decl."); Kroger Decl. ¶ 1.  These declarations fail to establish representational

standing for PEER because none of the declarants actually claims to be a "member" of PEER and,

further, none identifies a concrete injury-in-fact.

As to the first shortcoming, an association "only has standing to bring suit on behalf of its

*members* when its *members* would otherwise have standing to sue in their own right . . . ." *Gettman*

*v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002) (emphases in original).  A plaintiff group may not

assert standing on behalf of members if it "does not have any *members*." *Id.*; *see also Fund*

*Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (same).  An exception exists where an

organization without formal members operates as "the functional equivalent of a traditional

membership organization," including by (1) serving a specialized segment of the community; (2)

representing individuals who have all the "indicia of membership," such as electing the group's

leadership, serving in the group, and financing the group; and (3) having its fortunes "tied closely

to those of its constituency." *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C.

2007).  But Plaintiffs make no effort to fit within that exception here.

PEER concedes that it has no formal members, *see* Pls.' Mem. 20 n.10, and neither Mr.

Whitehouse, John Doe A, John Doe B, nor Mr. Kroger claims formal membership in PEER or

describes participating in the traditional "indicia of membership." John Doe A claims only that he

has "been a strong supporter of [PEER] for the last two years."  Doe A Decl. ¶ 2.  John Doe B

similarly states that he has been a PEER "supporter" since "early August of this year," Doe B Decl.

¶ 2, and Mr. Kroger also claims to have been a "supporter" of PEER "for several years."  Kroger

Decl. ¶ 1.  But neither the anonymous declarants nor Mr. Kroger describe a *single* action they have

taken to support PEER in their brief periods as "supporters," such as electing PEER's leaders,

volunteering in PEER, or donating money to PEER.[12]  Mr. Whitehouse identifies himself as an officer in PEER, but never in fact claims to be either a "member" or "supporter" of the group; nor does he describe himself as falling within the specialized segment of the community served by PEER.  *See* Whitehouse Decl. ¶ 2.  Because PEER has not identified a single supporter who is the functional equivalent of a traditional member, it may not assert representational standing.  *See Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 128 (D.D.C. 2019) (rejecting claim of associational standing where non-member plaintiff group "offer[ed] no evidence to support that [it] satisfies any of those factors" as to whether it is the equivalent of a membership organization); *Ctr. for Envtl. Sci., Accuracy & Reliability v. DOI*, No. CV 17-2313 (JDB), 2019 WL 2870131, at *3-4 (D.D.C. July 3, 2019) (denying associational standing where non-member plaintiff group "ha[d] not submitted any evidence suggesting that these individuals play any role in electing [its] leadership or in directing its activities").

Even if the Court were to consider the "harms" claimed by PEER's declarants, none amounts to a concrete and personalized injury-in-fact.  John Doe A admits that he does not actually have "any opinion about Mr. William Pendley . . . as a person," and in fact makes no claim about Mr. Pendley *at all*, instead generally opining that the absence of a Senate-confirmed BLM director

---

[12] Plaintiffs correctly note (at 19) that the Supreme Court's decision in *Hunt* conferred standing on a non-membership organization, but only because, as Plaintiffs admit, that organization possessed the "indicia" of a membership organization.  *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344-345 (1977).  As the Court explained, the constituents of that organization "elect the members of the Commission; they alone serve on the Commission; they alone finance its activities, including of this lawsuit, through assessments levied upon them."  *Id.* at 345-46.  But PEER's "supporters" here fail to identify *any* act they have taken on behalf of PEER.  *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 26 (D.C. Cir. 2002) (finding plaintiff organization "did not show that its 'supporters' played any role in selecting its leadership, guiding its activities, or financing those activities"); *Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987) (similar); *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 133 (D.D.C. 2014) (similar).

has "harmed the agency's overall functioning" and that morale is "rock-bottom" at the agency. *See* Doe A Decl. ¶ 3.  John Doe B says the same about NPS.  *See* Doe B. Decl. ¶ 3 (declaring that lack of Senate-confirmed NPS Director "harmed the agency's overall functioning" and "day-to-day effectiveness," resulting in "low" staff morale).  But he likewise does not directly attribute these problems to Defendants.  *Id.* (expressing "no opinion about Ms. Margaret Everson . . . as a person").  Further, neither anonymous declarant states that *his* morale or efficacy has been individually harmed. And, in any event, a negative mood or disagreement as to the general conduct of a federal agency does not constitute injury-in-fact.  *See, e.g.*, *In re Navy Chaplaincy*, 534 F.3d 756, 763 (D.C. Cir. 2008) ("[M]ere personal offense to government action does not give rise to standing to sue."); *Penkoski v. Bowser,* No. 20-CV-01519 (TNM), 2020 WL 4923620, at *4 (D.D.C. Aug. 21, 2020) (plaintiffs' "feelings of ostracization" and "divisiveness . . . alone cannot justify standing"); *New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv*., 208 F. Supp. 3d 142, 171 (D.D.C. 2016) ("[M]ore than hurt feelings over a defendant's allegedly wrong (or even illegal) policy choices is required for a plaintiff to have Article III standing to sue[.]").[13]

Mr. Whitehouse's claims of harm primarily concern impacts purportedly experienced by PEER as an organization.  *See* Whitehouse Decl. ¶¶ 8-11.  The only discernible claim of individualized harm that Mr. Whitehouse makes is the assertion that the NPS electronic bicycle policy has "impacted" him because he is a "frequent pedestrian on NPS land in Maryland along the C&O Canal National Park" and he has "regularly seen e-bikes on park trails and they negatively impact [his] ability to enjoy walking there due to their speed and disturbance that they cause."  *Id.* ¶ 9.  But this conclusory and abstract assertion of inconvenience fails to provide a specific and

---

[13] While Plaintiffs note that Mr. Kroger is also a PEER supporter, and that this "bolsters PEER's representational standing," Pls.' Mem. 17, they offer no additional reasons why Mr. Kroger has standing beyond those related to his membership in WWP.  *See supra* at 22.

concrete injury-in-fact.  *See Twin Rivers Paper*, 934 F.3d at 612-13 (holding that "a party cannot rest on abstract, or conclusory assertions of injury, but must point to specific, concrete facts demonstrating harm" (internal quotation marks and citations omitted)).

Moreover, the alleged "impact" of the electric bicycles policy on Mr. Whitehouse cannot serve as a basis for standing because Plaintiffs neither claim any injury nor seek any relief related to the policy, which PEER itself has challenged in separate litigation.  *See Whitehouse* Decl. ¶ 9 (citing *PEER v. NPS*, No. 1:19-cv-03629-RC (D.D.C.)).   In that case, PEER (among other plaintiffs) seeks to enjoin the NPS and Secretary Bernhardt (among other defendants) from implementing the electric bicycles policy for numerous reasons, including that then-Deputy Secretary Vela acted *ultra vires* and in violation of the FVRA when adopting the policies—similar grounds to those PEER now raises here.  Claiming the electric bicycles policy as the basis for an injury-in-fact in this case would result in impermissible claim-splitting.  *See Coulibaly v. Pompeo*, 318 F. Supp. 3d 176, 181–82 (D.D.C. 2018) (explaining that impermissible claim-splitting occurs when "plaintiff seeks to maintain two actions on the same subject, in the same court, against the same defendants at the same time" and that "the rule against claim splitting requires that all claims arising out of a single wrong be presented in one action" (alterations omitted)); *see also Dorsey v. Jacobson Holman PLLC*, 764 F.Supp.2d 209, 212 (D.D.C. 2011) ("The rule against claim splitting requires that all claims arising out of a single wrong be presented in one action." (citation omitted)).  Further still, doing so would likely require dismissal (or at minimum a stay) here in view of the first-to-file rule.  *See UtahAmerican Energy, Inc. v. DOL*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) ("The usual rule in this circuit has been that where two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first." (citation omitted)); *see also Intervet, Inc. v.*

*Merial, Ltd.*, 535 F. Supp. 2d 112, 114 (D.D.C. 2008) (dismissing later-filed case in same district under first-to-file rule).  Plaintiffs likely do not put forward the electric bicycles policy as a basis for standing in this case for these very reasons.[14]

Plaintiffs fail to establish any concrete and particularized injury-in-fact affecting their groups, their members, or their "supporters."  Accordingly, Plaintiffs may not claim representational standing on behalf of their members, and their claims should be dismissed.  *See Firearms Policy Coal., Inc. v. Barr*, 419 F. Supp. 3d 118, 125 (D.D.C. 2019) (dismissing case for lack of representational standing where organization failed to "identif[y] any specific member that would suffer some imminent and concrete harm"), *aff'd sub nom. Guedes v. ATF*, No. 19-5304, 2020 WL 6580046 (D.C. Cir. Oct. 30, 2020).

### D.    Plaintiffs Seek Relief Beyond This Court's Remedial Jurisdiction.

Plaintiffs' Prayer for Relief separately illustrates that there is no injury-in-fact specific to Plaintiffs at stake in this case.  *See* Second Suppl. Compl. pp. 16-17.  Plaintiffs request that the Court declare various orders and delegations void and enjoin Defendants from unspecified future conduct, but they conspicuously fail to seek any remedy meant to redress *specific* harms they allegedly suffered.  *Id.*  As described above, Plaintiffs admit that this case is not about such individualized harm—they are not targeting specific actions by Defendants, but are instead asserting generalized grievances in order to "vindicate" the Appointments Clause, separation of powers, and FVRA.  Pls.' Mem. 8.

---

[14] Plaintiffs' FOIA litigation against Mr. Pendley (*see* Pls.' Mem. 10), which they do not specifically identify by docket number, likely cannot serve as a basis for standing for the same reason.  Any relief related to PEER's FOIA request should be resolved through that first-filed litigation.

Such broad, open-ended relief is beyond the scope of this Court's jurisdiction. Even if Plaintiffs could show a concrete injury-in-fact—and they have not—their remedy would be limited to redressing those specific injuries. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("'[S]tanding is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Plaintiffs' wide-ranging and prospective Prayer for Relief reflects the fact that there is no discrete injury-in-fact specific to Plaintiffs for the Court to remedy here.[15]

Plaintiffs' requested relief is so far-ranging that, as to at least the first of the two counts on which they now seek summary judgment, it amounts to a request for an impermissible advisory opinion. Count I of the SSC alleges that Secretary Bernhardt's May 5, 2020 order delegated the non-exclusive duties of the NPS Director to Deputy Director Vela in violation of the FVRA, Administrative Procedure Act ("APA"), and Appointments Clause, and requests a declaration that the order is "contrary to the APA and FVRA and otherwise not in accordance with the law." Second Suppl. Compl. ¶¶ 37, 41, pp. 16-17. But Deputy Director Vela has since retired from NPS and ceased exercising those duties on August 10, 2020 when Secretary Bernhardt re-delegated

---

[15] This case is different from the District of Montana's decision in *Bullock* for this reason as well. While Defendants maintain the court erred in finding that the Governor of Montana and Montana Department of Natural Resources and Conservation had standing in that case, those plaintiffs at least "point[ed] to two policies . . . that BLM adopted under Pendley's direction and supervision to establish standing." *Bullock*, 2020 WL 5746836, at *3. (As the Government subsequently has made clear in *Bullock*, that finding of "direction and supervision" by Pendley is not supported by the record.) Moreover, in a subsequent remedial order, the court acknowledged "its limited jurisdiction under Article III," and thus offered a "limited remedy" restricted only to those *specific* actions challenged by plaintiffs. *Bullock v. BLM*, No. 4:20-CV-00062-BMM, 2020 WL 6204334, at *4 (D. Mont. Oct. 16, 2020). By contrast, Plaintiffs here point to no such specific acts or policies by Defendants and seek unbounded relief.

them to Ms. Everson.  *See* Pls.' Mem. 25.  Declaring the May 5, 2020 order unlawful as to Deputy

Director Vela "cannot affect the rights of the litigants" in this case and thus would amount to an

advisory opinion.  *NBC-USA Hous., Inc., Twenty-Six v. Donovan*, 674 F.3d 869, 872 (D.C. Cir.

2012); *see also Akins*, 524 U.S. at 24 ("The abstract nature of the harm—for example, injury to

the interest in seeing that the law is obeyed—deprives the case of the concrete specificity" required

for standing and "prevents a plaintiff from obtaining what would, in effect, amount to an advisory

opinion.").  The Court lacks jurisdiction to provide Plaintiffs such an advisory opinion, or any of

their overbroad relief.[16]

## II.   THE SECRETARY LAWFULLY DELEATED NON-EXCLUSIVE DUTIES OF THE NPS DIRECTOR TO MS. EVERSON.

Plaintiffs' motion for partial summary judgment fails on the merits as well.  Plaintiffs'

theory is that Ms. Everson's exercise of the delegable responsibilities of the NPS Director violates

the Appointments Clause because she is not the Senate-confirmed Director or an Acting Director

under the FVRA.  *See* Pls.' Mem. 29-36.  The FVRA only governs the designation of an "acting"

PAS officials and not the designation of delegatees exercising the properly delegable duties of that

office.  Accordingly, Ms. Everson's continued exercise of the duties properly delegated to her by

the Secretary is constitutional and in compliance with Federal law.

---

[16] Plaintiffs' request for prospective injunctive relief against Mr. Pendley and Ms. Everson will become moot on January 20, 2021 when a new administration is sworn into office.  At that time, Mr. Pendley and Ms. Everson will, presumably, leave office, requiring that the prospective claims against them must be dismissed.  *See, e.g.*, *Hammer v. Ashcroft*, 512 F.3d 961, 970-971 (7th Cir. 2008) (plaintiff's claim against public officials was "moot because none of the defendants currently hold the positions in which they were sued"), *reh'g en banc granted, opinion vacated on other grounds* (Aug. 19, 2008), *on reh'g en banc,* 570 F.3d 798 (7th Cir. 2009); *Tara Enterprises, Inc. v. Humble*, 622 F.2d 400, 401 (8th Cir. 1980) (finding claims moot where court could not grant "any other relief which would be operative against these defendants who no longer possess any official power"); *Blackburn v. Goodwin*, 608 F.2d 919, 925 (2d Cir. 1979) (finding case moot where defendant "d[id] not have the official capacity necessary to enable him to comply with the injunctive relief sought" due to departure from office).

It is a bedrock principle of administrative law that, absent clear indication to the contrary, the authority vested in a particular officer may be delegated to her subordinates. *See Mobley v. C.I.A.*, 806 F.3d 568, 585 (D.C. Cir. 2015) ("Sub-delegation to a subordinate federal official is presumptively permissible, absent affirmative evidence in the original delegation of a contrary intent."); *Loma Linda Univ. v. Schweiker*, 705 F.2d 1123, 1128 (9th Cir. 1983) (upholding re-delegation of authority by Administrator of Health Care Financing Administration to Deputy Administrator); *see also Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 122-23 (1947) (requiring "all the various functions granted the [agency head] [to] be performed personally by him or under his personal direction . . . would be apt to end in paralysis"). "When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004).

As a result, delegations of the duties of PAS officers are commonplace in the Federal Government. *See, e.g.*, 28 C.F.R. § 0.15(a) (delegating all authority of Attorney General to Deputy Attorney General, "unless any such power or authority is required by law to be exercised by the Attorney General personally"); 28 C.F.R. Pt. 0, App'x to Sub pt. R § 12 (delegating to DEA Deputy Administrator authority to perform "all necessary functions" under DEA regulations); 49 C.F.R. § 1.23 (delegating all authority of Secretary of Transportation to Deputy Secretary, subject to specific limitations). That is true even in the context of vacancies in PAS offices. *See, e.g.*, *Stand Up for California! v. DOI*, 298 F. Supp. 3d 136, 137 (D.D.C. 2018) (recognizing Government's need for "complicated . . . delegation regulations" to deal with vacancies); *see also* 49 C.F.R. § 1502.1 (in event of "absence or disability" of Administrator and Deputy Administrator of Transportation Security Administration, officials designated by agency "shall perform the duties

30

of the Administrator, except for any non-delegable statutory and/or regulatory duties"); DM Pt. 302, Ch. 2 (establishing responsibilities, standards, and procedures for delegating authority to designated successors of vacant PAS offices).

Plaintiffs do not appear to argue—and certainly cite no authority for the proposition—that *any* delegation of the authority of a vacant PAS office violates the Appointments Clause. Rather, they assert two arguments: (i) that Ms. Everson's (and Deputy Director Vela's) exercise of the authority of the NPS Director under a delegation violates the Appointments Clause because she is (and he was) not eligible to serve as Acting Director under the FVRA, *see* Pls.' Mem. 29-35; and (ii) that the multiple extensions of temporary delegation orders have created an "effectively permanent" appointment allowing an "end-run around the strictures of the Appointments Clause," *id.* at 35-36. Both arguments lack merit.

### A. The FVRA Itself Authorizes the Delegation of Non-Exclusive Duties of the Director of NPS.

Absent an exception, the FVRA establishes the "exclusive means" for designating an acting official in a PAS position. 5 U.S.C. § 3347(a). But the FVRA only applies to *acting officials*, not to delegatees exercising authority under delegations. Indeed, the FVRA itself acknowledges and retains the longstanding principle that the non-exclusive powers of a vacant PAS office can be delegated. For this reason, Ms. Everson's exercise of the delegable duties of the NPS Director does not violate the FVRA.

Delegations of duties to non-acting officials is addressed by 5 U.S.C. § 3348(b) in the FVRA. Section 3348(b) provides that when the FVRA's time limits for acting service have been exceeded (as they have been here), the PAS office "shall remain vacant" and only the head of the department may "perform any *function or duty*" of the office. *Id.* § 3348(b) (emphasis added). Section 3348 narrowly defines a "function or duty" of an office for purposes of that section as "any

function or duty of the applicable office that . . . is established by statute" or "regulation" and that "is *required* by statute" or "such regulation" "to be performed by the applicable officer (*and only that officer*)." *Id.* § 3348(a)(2) (emphases added).

The definition of "function or duty" for purposes of § 3348(b) does not encompass functions or duties that may be delegated to officials other than the one named in the statute or regulation creating the authority. Rather, it covers only non-delegable duties. *See Guedes*, 920 F.3d at 12 (recognizing that "function or duty" applies "only" to "nondelegable duties"); *Stand Up*, 298 F. Supp. 3d at 150 ("functions and duties" do not encompass "non-exclusive responsibilities" that can "delegated to other appropriate officers and employees" (citation omitted)); *see also United States v. Harris Cty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017) (authorization of complaint by Principal Deputy Assistant Attorney General was not "function or duty" because "the relevant duties of the [office] are delegable"); Order at 5, *United States v. Vill. of Tinley Park*, No. 1:16-cv-10848 (N.D. Ill. July 17, 2017), ECF No. 55 (holding that "function or duty . . . does not include a delegable duty that could be performed by another officer"). That is because if a function or duty is lawfully delegable, then necessarily, the statute or regulation creating that function or duty does not "require" it to be performed only by the vacant office. Rather, the statute or regulation permits other individuals to perform that function or duty by delegation.[17]

---

[17] Plaintiffs point (at 33-34) to the Court's decision in *L.M.-M. v. Cuccinelli*, which interpreted "function or duty" in the context of § 3348(d) to refer to a function that is assigned "to a single PAS office" and which has not been "reassign[ed] . . . using his vesting-and-delegation authority or any other authority at least 180 days before the vacancy occurred." 442 F. Supp. 3d 1, 34 (D.D.C. 2020) (Moss, J.). While the Government respectfully disagrees with that ruling, it does not help Plaintiffs. The Court in *L.M.-M.* was specifically concerned with duties that had not been delegated, and could be performed only by either the sub-cabinet official whose acting service was in question or the department head. *Id.* Accordingly, the Court distinguished between that class of duties and those that could be performed by officials other than the vacant office and department

This conclusion is clear from the text of the FVRA.  But even if any doubt remains, the legislative history confirms that Congress never intended to displace agencies' general authority to delegate the non-exclusive duties of a vacant PAS office.  The Senate Report accompanying an earlier version of the bill explained that, in the absence of a properly serving acting official, "[t]he functions or duties of the office" that could only be performed by the agency head, are "defined as the *non-delegable* functions or duties of the officer."  S. Rep. No. 105-250, at 18 (1988) (emphasis added).  By contrast, the "[d]elegable functions of the office could still be performed by other officers or employees."  *Id.*  Even though Congress was aware that many Senate-confirmed officers lacked exclusive functions or duties, *id.*; *id.* at 10, it adopted this narrow definition specifically to ensure that, even without a properly serving acting official, "[a]ll the normal functions of government thus could still be performed."  *Id.* at 18; *accord id.* at 31 (views of supporting Senators stating that § 3348 should "not cause an unintended shutdown of the Federal agency within which the vacancy exists due to administrative paralysis"); *id.* at 36 (views of opposing Senators).

The Executive Branch has understood the FVRA to operate in this manner since its enactment.  *See Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 72 (1999) [hereinafter "*OLC Guidance*"] (recognizing that FVRA "permits non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency" to ensure that "the business of the government [w]ould [not] be seriously impaired"); *accord Under*

---

head prior to the vacancy, concluding that the definition of "function or duty" did not encompass functions that had actually been delegated at least 180 days before the vacancy.  *Id.*; *see also Nw. Immigrants Rts. Project v. USCIS*, No. 19-cv-3283 (RDM), 2020 WL 5995206, at *16 (D.D.C. Oct. 8, 2020) (Moss, J.) (rulemaking authority was not "function or duty" of DHS Secretary where authority had been delegated years earlier); *Stand Up*, 298 F. Supp. 3d at 149-50 (addressing delegation that applied in "absence" of PAS officer).  As discussed below, any authority that Ms. Everson may lawfully exercise was delegated to other officials long before the vacancy arising from former Director Jarvis's resignation.

*Secretary for the Treasury for Enforcement*, 26 Op. O.L.C. 230, 233-34 (2002).  For its part, the

Government Accountability Office, a non-partisan agency within the Legislative Branch, has long

agreed.  *See Federal Vacancies Reform Act of 1998 – Assistant Attorney General for the Office of*

*Legal Counsel, U.S. Department of Justice*, B-310780 at 4 (GAO June 13, 2008) [hereinafter

"*GAO 2008 Decision*"] ("function or duty" under § 3348 are those that are "non-delegable" and

"may only be performed by an agency head during those times when an office is vacant"),

*available at* https://www.gao.gov/assets/390/383258.pdf.

　　　In other words, under the FVRA, only the agency head or a validly serving acting official

can perform duties that are made exclusive to the vacant PAS office by statute or regulation.  But

*non-exclusive* duties, such as those delegated to Ms. Everson, can still be performed by other

officials.  *See, e.g.*, *Stand Up*, 298 F. Supp. 3d at 149 ("[T]he FVRA permits non-exclusive

responsibilities to be delegated to other appropriate officers and employees in the agency."

(citation omitted)); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 420 (D. Conn.

2008) ("[A]ny functions or duties not required by statute or regulation to be performed by the

official occupying that position may be reassigned to another official within the agency or

department."), *aff'd*, 587 F.3d 132 (2d Cir. 2009); *see also L.M.-M.*, 442 F. Supp. 3d at 34

(recognizing that even when § 3348(b) requires an office to remain vacant, "[d]epartment heads

and other officials may also delegate duties to multiple officials").

　　　In *Stand Up*, for example, the Senate-confirmed Assistant Secretary-Indian Affairs ("AS-

IA") in the Bureau of Indian Affairs resigned on December 31, 2015, and his Principal Deputy,

Lawrence Roberts, became Acting AS-IA as first assistant to the vacant office.  *Stand Up*, 298 F.

Supp. 3d at 141.  Mr. Roberts served as Acting AS-IA for 210 days, after which he reverted to his

role as Principal Deputy and the AS-IA position remained vacant by operation of § 3348(b)(1).

*Id.* Under Department of the Interior policies, the Principal Deputy was delegated the non-exclusive functions or duties of the AS-IA. *Id.* at 149-50. The Court rejected the plaintiffs' argument that an action taken by Mr. Roberts under that delegated authority violated the FVRA. *Id.* at 150. As the Court recognized, "during the 210-day period" of permissible FVRA service, Mr. Roberts could "exercise duties both exclusive and non-exclusive to th[e] office" of AS-IA. *Id.* But "[a]fter the 210-day period, in the continued absence of a PAS [AS-IA], the FVRA permits non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency." *Id.* (citation omitted); *accord Harris Cty.*, 2017 WL 7692396, at *3 n.5 (upholding action taken by Vanita Gupta as Principal Deputy Assistant Attorney General for Civil Rights under delegated authority of Assistant Attorney General when FVRA period for her service as Acting Assistant Attorney General had expired); *GAO 2008 Decision* at 4-5 (concluding that Principal Deputy Assistant Attorney General for OLC Stephen Bradbury, who had been unsuccessfully nominated to be Assistant Attorney General for OLC on several occasions, could perform functions of vacant Assistant Attorney General position intermittently over four year period without violating FVRA).

Accordingly, Secretary Bernhardt's delegation of the non-exclusive duties of the NPS Director to Ms. Everson does not violate the FVRA. By definition, the duties she has been assigned are not "function[s] or dut[ies]" of the office under § 3348 because they are not required by statute or regulation to be performed only by the Director. Indeed, these duties not only *can* be delegated, but in fact have long *been delegated*. *See* Foster Decl., Ex. 3 (November 2008 Order); *see also Nw. Immigrants Rts.*, 2020 WL 5995206, at *16 ("function or duty" under § 3348 did not encompass authority that had been delegated prior to vacancy); *Stand Up*, 298 F. Supp. 3d at 149-

50 ("function or duty" did not encompass authority delegated in "absence of" PAS officer).[18]

Plaintiffs argue that such delegations violate the FVRA's exclusivity provision, 5 U.S.C. § 3347, which provides that the FVRA is the "exclusive means" of designating an acting official unless an exception applies, *id.* § 3347(a), and states that a statutory provision allowing an agency head to "delegate" or "reassign duties" does not qualify as such an exception, *id.* § 3347(b).  *See* Pls.' Mem. at 34-35; *id.* at 35-36.  But, as discussed above, the FVRA does not apply to restrict the delegation of non-exclusive duties during a vacancy in a PAS office, nor do delegations conflict with § 3347(b) because a delegation does not transform a delegatee into the acting official.  The FVRA, by its own terms, draws the distinction between the exclusive duties of a PAS office— which may only be performed by a validly serving acting official or the department head, where there is no acting official—and the non-exclusive duties—which can be performed by others pursuant to a delegation.  *See* 5 U.S.C. § 3348(b)(2); S. Rep. No. 105-250, at 18.

---

[18] To be sure, most but not all of the duties of the NPS Director are not exclusive to that office. *See* 36 C.F.R. § 51.25 (providing that "[t]he Director must personally approve" the award of a concession contract without public solicitation "with the prior written approval of the Secretary"). But Congress was aware when enacting the FVRA that many offices would lack functions or duties, as defined under § 3348.  *See* S. Rep. No. 105-250, at 18 (recognizing that "so many" PAS officers "lack any meaningful statutory duties"); *id.* at 10 (recognizing that certain assistant secretaries and assistant attorneys general lack "statutory dut[ies]" other than to "assist the secretary or the attorney general"); *see also OLC Guidance*, 23 Op. O.L.C. at 72 (Congress "permit[ted] non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency," even though "[m]ost, and in many cases all, the responsibilities performed by a [Senate-confirmed] officer will not be exclusive"); *GAO 2008 Decision* at 5 (Principal Deputy Assistant Attorney General could perform functions of Assistant Attorney General pursuant to delegation because "the position of Assistant Attorney General for OLC has no non-delegable duties or functions").  For that matter, Plaintiffs' decision to eschew a challenge to any actual agency action in their pursuit of a blanket declaration that NPS is operating unlawfully is particularly improper for this reason.  In a challenge to an action taken by a delegated official, the analysis centers on whether the relevant duty is or is not exclusive to the vacant PAS office.  *See Stand Up*, 298 F. Supp. 3d at 142-49; *cf. L.M.-M.*, 442 F. Supp. 3d at 34 (function of office is not "function or duty" under FVRA if it has been previously delegated to another officer or employee).  The Court cannot engage in that analysis here because Plaintiffs do not challenge *any particular duty* of the Director.

For similar reasons, Plaintiffs' reliance on the District of Montana's decision in *Bullock*, *see* Pls.' Mem. 36-38, does not change this analysis.  The *Bullock* decision was based on the court's erroneous conclusion that the distinction between "an 'Acting Director' [and] an 'official performing the Director's duties under the Secretary's delegation' represents a distinction without a difference" and is inconsistent with the text and context of the FVRA.  *Bullock*, 2020 WL 5746836, at *8; *see also id.* at *9 (concluding delegations to Mr. Pendley, as Deputy Director of Policy and Programs at BLM, "improperly empowered Pendley as the Acting BLM Director"). But the *Bullock* court pointed to nothing, in the FVRA or elsewhere, indicating that a *delegatee* is the same thing as an *acting official*.  It is the *FVRA itself* that creates the distinction between the two.[19]

Plaintiffs urge the Court to erase the FVRA's distinction between a delegatee and an acting officer.  But doing so would upend Congress's carefully calibrated scheme in § 3348 to *permit* "[d]elegable functions of the office [to] still be performed by other officers or employees." S. Rep. No. 105-250, at 18.  The narrow delimitation of what duties may not be performed by a delegatee in the event of a vacancy reflects a conscious choice by Congress not to allow the absence of a properly serving acting official to paralyze agencies.  *Id.* at 18 (allowing "delegable functions" to "be performed by other officers" would ensure that "[a]ll the normal function of government . . . could still be performed"); *OLC Guidance*, 23 Op. O.L.C. at 72 (limited definition of "function or duty" was motivated by Congress's "underst[anding] that if everything the PAS officer may have done in the performance of his or her duties had to be performed by the head of the Executive

---

[19] Plaintiffs' reliance on purported "portray[als]" in "[p]opular media" of Ms. Everson as the "acting or *de facto* Director," Pls.' Mem. 30, is irrelevant.  Plaintiffs offer no explanation as to why third-party characterizations of Ms. Everson's purported position would inform what her actual position in the Department is.  Nor for that matter could Ms. Everson be Acting Director, as none of the FVRA's three means for acting service apply to her.  *See* 5 U.S.C. § 3345(a)(1)-(3).

agency, the business of the government could be seriously impaired").

Under Plaintiffs' theory, the Senate could for any reason return submitted nominations to not only keep the PAS office vacant, but also to eventually prevent *anyone* other than the department head from performing even previously delegated authority of the vacant office. *See* 5 U.S.C. § 3346 (barring acting service under FVRA beyond 210 days after rejection, withdrawal, or return of second nomination). That outcome would allow the Senate to hamstring Executive agencies and enable the administrative paralysis that Congress specifically sought to avoid through the FVRA. *See, e.g.*, *Stand Up*, 298 F. Supp. 3d at 137 (discussing agencies' use of "complicated succession and delegation regulations" to address "acute" problem "during presidential transitions, when thousands of senior political appointees exit the government, often leaving their positions vacant for months even years"). The Court therefore should reject Plaintiffs' theory.[20]

### B.   Plaintiffs' Challenge to the Duration of the Delegations Fails.

---

[20] Plaintiffs' detour into the June 4, 2020 order issued by Deputy Director Vela, *see* Pls.' Mem. 32-35, is a dead end. As explained above, Plaintiffs challenge no action taken by Deputy Director Vela, who has since retired from NPS, and thus their claims relating to him are impermissible requests for an advisory opinion. *See supra* at 29. In any event, Plaintiffs misunderstand the effect of the June 4, 2020 order. *See* Foster Decl., Ex. 6. The order did not designate *Mr. Vela* as the first assistant to the office of the Director; instead, the order simply re-delegated the non-exclusive authority of the NPS Director, under a clear grant of authority in the Departmental Manual. *See* DM Pt. 302, Ch. 2 § 2.3-2.5 (authorizing designation line of officials who can exercise delegated authority of vacant PAS office). The references to the FVRA merely relate to the authority agencies have to designate their own first assistants where Congress has not done so. S. Rep No. 105-250, at 12 (recognizing that agencies have established their own first assistants). Moreover, the order was approved by the Senate-confirmed Assistant Secretary for Fish and Wildlife and Parks, who has supervisory responsibility over NPS. *Cf. United States v. Hartwell*, 73 U.S. (6 Wall) 386, 393-94 & n.9 (1867) (action taken "with the approbation of" a superior officer can be considered action of superior). Plaintiffs' similar tangent relating to former Deputy Director Smith, *see* Pls.' Mem. 31, is even further afield. Just like with Mr. Vela, Mr. Smith could not have been the Acting Director under the FVRA and, at all times, remained the Deputy Director. *See* Foster Decl. ¶ 12. Inaccurate references to Mr. Smith's position made in an email and an online press release cannot change Mr. Smith's status or the operation of the FVRA. Nor would they be relevant here as Plaintiffs have never named Mr. Smith as a Defendant in this action nor challenged any action taken by Mr. Smith pursuant to authority he allegedly did not have.

Plaintiffs argue that the Secretary's delegation orders are unconstitutional because the multiple extensions of those orders constitute an "effectively permanent" appointment without Senate confirmation.  Pls.' Mem. 36.

This claim fails at the threshold because Plaintiffs offer no judicially manageable standard by which the Court could judge how long is too long for a delegation.  Plaintiffs do not argue that every delegation of authority in the context of a vacant PAS office is invalid.  *See* Second Suppl. Compl. ¶¶ 37-46 (challenging only delegations from May 5, 2020 onward).  Rather, they suggest that after some period, a lawful delegation transforms into an unlawful one.  But Plaintiffs offer no standard to determine when that threshold has been crossed.  The Constitution imposes no fixed time limit on an official's exercise of delegated authority; nor does the FVRA.  Indeed, the FVRA expressly allows even *acting* officials to serve for years—*viz.*, 210 days of service (or 300 if after a Presidential transition, *see* 5 U.S.C. § 3349(a)(b)) after the vacancy, *see id.* § 3346(a)(1); non-time limited service during the pendency of a first nomination, *id.* § 3346(a)(2); another 210 days of service if the first nomination is rejected, withdrawn, or returned, *id.* § 3346(b)(1); another period of non-time limited service during the pendency of a second nomination, *id.* § 3346(a)(2); and then another 210 days of service if the second nomination is rejected, withdrawn, or returned, *id.* § 3346(b)(2)(B).

The length of the delegations at NPS is also not the unprecedented circumstance that Plaintiffs suggest it is.  *See GAO 2008 Decision* at 4-5 (discussing repeated periods of exercise of non-exclusive authority by unsuccessfully-nominated deputy over four-year period); *see also Nw. Immigrants Rts.*, 2020 WL 5995206, at *16 (discussing 2003 delegation of authority that remains in effect).  For example, Thomas Brandon served as the top official of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, as Acting Director, when the FVRA permitted, and as Deputy

Director exercising delegated authority, for over four years between 2015 and 2019.[21]

Without a clear standard to delineate the duration of constitutionally permissible service, courts have held that related challenges to the length of service of acting officials raise non-justiciable political questions. *See Bhatti v. Fed. Housing Fin. Agency*, 332 F. Supp. 3d 1206, 1221 (D. Minn. 2018) (dismissing Appointments Clause challenge based on duration of service by Acting Director of FHFA, who served for more than four years in that role), *appeal docketed*, No. 18-2506 (8th Cir. July 16, 2018); *Rop v. Fed. Housing Fin. Agency*, No. 1:17-CV-497, 2020 WL 5361991, at *28-29 (W.D. Mich. Sept. 8, 2020) (same). By empowering the President and Congress to determine who serves as an "Officer of the United States" in a permanent capacity, the Appointments Clause reflects a "textually demonstrable constitutional commitment of the issue to a coordinate political department," and leaves no "judicially discoverable and manageable standards" for a court to apply. *Baker v. Carr*, 369 U.S. 186, 217 (1962). And for a court to craft and impose a constitutional tenure requirement, it would need to inquire into matters—such as where having a NPS Director should fit in the President's priorities or the inter-branch dynamics between the President and the Senate—that "are not normally the subject of judicial inquiry." *Bhatti*, 332 F. Supp. 3d at 1218; *Rop*, 2020 WL 5361991, at *28 (same).

Plaintiffs' theory also raises significant practical problems stemming from an inability to divine the precise point at which a delegation to a particular official becomes unconstitutionally lengthy. *Bhatti*, 332 F. Supp. 3d at 1219 ("Nor would it even be possible—as conditions fluctuate from day to day, week to week, month to month—to contemporaneously identify the moment at

---

[21] *See* ATF Industry Newsletter (Aug. 2015), https://www.atf.gov/explosives/docs/newsletter/explosives-industry-newsletter-august-2015/download; FFL Newsletter (2019), https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensee-newsletter-2019/download.

which the acting officer's tenure became too long."). This uncertainty, coupled with the prospect of subsequent judicial invalidation of any agency action taken after that unknowable point, would sow substantial confusion amidst those who have business before the agency and the public, thereby undermining important reliance interests. *See id.* (interested parties "would have [no] way of knowing whether the acting officer who was heading the agency had lost his or her authority to act," and thus "would have to order their affairs with the knowledge that, at some point years later, a judge acting with the benefit of hindsight might pronounce the length of the tenure unreasonable and pick an essentially arbitrary point beyond which the officer's actions will be deemed invalid").

Even if the Court were to reach the issue, it should reject Plaintiffs' assertion that the delegation orders represent an unconstitutional appointment to the office of Director of NPS. As discussed above, delegations are not appointments—they are not even designations to serve as an acting official—and thus do not raise the same constitutional concerns as appointments. *See Schaghticoke Tribal Nation*, 587 F. Supp. 2d at 421 (rejecting argument that delegation beyond FVRA's time limits was unlawful because FVRA "sets no time limits . . . on re-delegations of nonexclusive duties" and thus "the only time limitations relevant in this case are those set by the Secretary in her order delegating certain responsibilities").

Further, even if the Court were to construe Secretary's Order 3381 as an effective appointment of Ms. Everson—which it should not—then that Order would satisfy the requirements for a constitutional appointment of an inferior officer. Given its position in the Department hierarchy, there is little doubt that the NPS Director is an inferior officer. *See, e.g.*, 43 U.S.C. § 1451 (Secretary is "the head" of Department of the Interior); *id.* § 1452 (establishing office of Deputy Secretary); *id.* §§ 1453, 1453a (establishing offices of Assistant Secretaries); *see also Edmond v. United States*, 520 U.S. 651, 663 (1997) ("Generally speaking . . . [w]hether one is an

'inferior' officer depends on whether he has a superior."). Under the Appointments Clause, Congress may permissibly vest the appointment of inferior officers in the "Heads of Departments," U.S. Const. art. II, § 2, cl. 2, which the Secretary indisputably is.[22]

While Congress did not vest the appointment of a permanent NPS Director in the Secretary of Interior, it nevertheless gave the Secretary the broad power to delegate his authority to other officials in the Department, *see* Reorganization Plan No. 3 of 1950 § 2, and confirmed in the FVRA that agencies would retain their authority to delegate the non-exclusive duties of a vacant PAS office. If Plaintiffs are correct that the delegation of most of the authority of the NPS Director could itself be considered an appointment to a "de facto Director" position, *see* Pls.' Mem. 30, then Congress has specifically granted the Secretary the authority to make appointments like this. Thus, if the Court were to conclude that Ms. Everson has been appointed to a position by Secretary's Order 3381, then it should treat the Order as a lawful appointment of an inferior officer. *See Guedes v. ATF*, 356 F. Supp. 3d 109, 154-55 (D.D.C. 2019) (construing Presidential "direct[ion]" under FVRA, 5 U.S.C. § 3345(a)(3), as constitutional "appointment" for purposes of Appointments Clause), *aff'd on other grounds* 920 F.3d 1 (D.C. Cir. 2019).[23]

## III.   AN ADMINISTRATIVE RECORD INDEX IS NOT REQUIRED AT THIS STAGE

Plaintiffs also contend that Defendants were required to file a certified copy of the index of the Administrative Record with their Motion to Dismiss. *See* Pls.' Mem. 6-7 (citing Local Civil

---

[22] Although Plaintiffs appear to suggest in places that all officers must be appointed with Senate confirmation, *see* Pls.' Mem. 23, 29, that is inconsistent with the Appointments Clause itself, which does not require Senate confirmation for inferior officers.

[23] Plaintiffs' reference to the decision in *Casa de Maryland v. Wolf*, --- F. Supp. 3d ----, 2020 WL 5500165 (D. Md. Sept. 11, 2020), is both unexplained and inapposite. *See* Pls.' Mem. 38. There, the court preliminarily enjoined various asylum work authorization rules based on its interpretation of an order of succession issued by the then-Secretary of Homeland Security. *Casa de Maryland*, 2020 WL 5500165, at *21-22. Plaintiffs do not explain what relevance a decision based on the wording of a specific document from a different agency could possibly have here.

Rule 7(n)(1)).   The cited rule provides that in a case "involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court . . . simultaneously with the filing of a dispositive motion[.]"  LCvR 7(n)(1).  However, courts within this district have uniformly held that Local Civil Rule 7(n)(1) does not apply where the administrative record has no bearing on the dispositive motion.   For example, in *Carroll v. Office of Fed. Contract Compliance Programs, United States Dep't of Labor*, 235 F. Supp. 3d 79, 81 n.1 (D.D.C. 2017), the court concluded there was no need to file the administrative record because it was "'immaterial' to resolution of defendant's Motion."   Defendants' motion to dismiss here is premised entirely on jurisdictional grounds and therefore, as in *Carroll*, the record is "immaterial" to resolution of the motion.  *Id.*; *see also Jimenez Verastegui v. Wolf*, No. CV 18-2358 (TJK), 2020 WL 3297230, at *2 n.3 (D.D.C. June 18, 2020) (rejecting similar argument and finding that the index was "irrelevant to the Court's determination that it lacks subject-matter jurisdiction, so the Court need not consider that issue").[24]   Indeed, Local Civil Rule 7's purpose is to "assist the Court in cases involving a voluminous record . . . by providing the Court with copies of the relevant portions of the record relied upon any dispositive motion."   LCvR 7(n) cmt.1.   But that rationale has no applicability where, as here, the dispositive motion is purely jurisdictional and does not rely upon the record in any way.

Defendants are also unaware of any authority requiring that a motion be *stricken* under Local Civil Rule 7 for failure to file an administrative record.   The court in *Carroll* observed that

---

[24] Plaintiffs' insistence on the filing of the administrative record is undermined by their own decision to file an expedited motion for summary judgment prior to entry of the record.  *See* ECF No. 16.   The administrative record cannot, on the one hand, be highly relevant to resolving Defendants' purely jurisdictional motion to dismiss, and on the other hand, irrelevant to Plaintiffs' motion for summary judgment on the merits.

the plaintiff had not cited "any authority for the proposition that the failure to include a certified list is grounds for striking a motion to dismiss." *Carroll*, 235 F. Supp. 3d at 81 n.1. Plaintiffs here, likewise, fail to cite any such authority.[25]

Because the administrative record is immaterial to resolving Defendants' Rule 12(b)(1) motion to dismiss, the Court should deny Plaintiffs' request to strike the Motion to Dismiss.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion to dismiss.

---

[25] In the alternative, the Court may construe Defendants' Motion to Dismiss as incorporating a meritorious request to waive compliance with Local Rule 7(n)(1). *See Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 (D.D.C. 2017).

Dated December 23, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
*Assistant Attorney General*
Environment & Natural Resources Division
*Acting Assistant Attorney General*
Civil Division

CHRISTOPHER R. HALL
*Assistant Branch Director*

*/s/ Christopher D. Dodge*
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
MICHAEL DREZNER (VA Bar No. 83836)
CHETAN A. PATIL (DC Bar No. 999948)
BRADLEY CRAIGMYLE
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-5571
Facsimile: (202) 616-8460
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY; WESTERN WATERSHEDS PROJECT,<br><br>                              Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, Secretary of the Interior, in his official capacity; WILLIAM PENDLEY, Deputy Director, Bureau of Land Management, in his official capacity; and MARGARET EVERSON, National Park Service, in her official capacity,<br><br>                              Defendants. | Civil Action No. 1:20-cv-1224-TSC |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

Defendants respond to Plaintiffs' proposed statements of material facts as to which there is no genuine issue filed in support of their motion for expedited summary judgment.

1.       The initial appointment of a National Park Service (NPS) acting Director pertinent here began in office when former Secretary of the Interior Ryan Zinke appointed Mr. P. Daniel Smith as "acting Director" of the NPS on January 24, 2018.[1]

**Defendants' Response:**  Disputed.  Mr. Smith was never appointed Acting Director of NPS.  Mr. Smith was delegated the non-exclusive functions and duties of the Director of NPS. Declaration of Maureen Danaher Foster ¶ 12 ("Foster Decl."); Department of the Interior, *Department of the Interior Names New National Park Service Deputy Director* (Jan. 9, 2018),

---

[1] NPS News Release, "Secretary Zinke Announces Changes in National Park Service Leadership," January 24, 2018, at: https://www.nps.gov/orgs/1207/01-24-2018-leadership.htm .

https://www.doi.gov/pressreleases/department-interior-names-new-national-park-service-deputy-director.  Further, the statement is immaterial, as Plaintiffs do not seek to challenge any purported action taken by Mr. Smith on this ground and Mr. Smith is not and has never been a Defendant in this action.

1.A.    Various official NPS documents confirm that Mr. Smith was presented both externally and internally as the acting Director of the agency.  See the attached Declaration of Peter T. Jenkins Identifying Two Documents, which attaches Exh. A an NPS News Release, "NPS Acting Director Smith Names New Chief Spokesperson," dated January 30, 2018, which has quotes from, "acting National Park Service (NPS) Director P. Daniel Smith".  Exh. B is an email from Mr. Smith with the following source information: from the "Director, NPS, Mon 2/12/2018" to "NPS All Employees".  In it Mr. Smith states he is "now in the role of Acting Director".

**Defendants' Response:**    Disputed.    Notwithstanding the cited statements, which inaccurately describe Mr. Smith's position at NPS, Mr. Smith was never appointed Acting Director of NPS.  Mr. Smith was delegated the non-exclusive functions and duties of the Director of NPS. Declaration of Maureen Danaher Foster ¶ 12 ("Foster Decl."); Department of the Interior, *Department of the Interior Names New National Park Service Deputy Director* (Jan. 9, 2018), https://www.doi.gov/pressreleases/department-interior-names-new-national-park-service-deputy-director.  Further, the cited inaccurate descriptions are immaterial, as Plaintiffs do not seek to challenge any purported action taken by Mr. Smith on this ground and Mr. Smith is not and has never been a Defendant in this action.

2.    Defendant Secretary of the Interior David Bernhardt replaced Mr. Zinke and he later appointed Mr. Smith as Deputy Director and he "redelegated" authority to Mr. Smith to exercise the authority of the NPS Director. The final Bernhardt Redelegation Order under which

Mr. Smith served was Amendment No. 28, dated July 29, 2019.[2]

**Defendants' Response:** Disputed. Defendants admit that Secretary Bernhardt replaced former Secretary Zinke as the Secretary of the Interior. Defendants dispute that Secretary Bernhardt appointed Mr. Smith as Deputy Director, who was assigned to that position by Secretary Zinke. *See* Department of the Interior, *Department of the Interior Names New National Park Service Deputy Director* (Jan. 9, 2018), https://www.doi.gov/pressreleases/department-interior-names-new-national-park-service-deputy-director. Defendants admit that Secretary Bernhardt delegated the non-exclusive functions and duties of the NPS Director to Mr. Smith and that the final order under which Mr. Smith was delegated these functions and duties was Secretary's Order (SO) 3345 Amendment No. 28, issued on July 29, 2019. Defendants further note that the statement is immaterial, as Plaintiffs do not seek to challenge any purported action taken by Mr. Smith on this ground and Mr. Smith is not and has never been a Defendant in this action.

3.      Then, the former Defendant in this case, David Vela, began in the role of NPS Deputy Director "exercising the authority of the Director," pursuant to Secretary Bernhardt's redelegation Order Amendment No. 29, effective September 30, 2019.[3] Vela's appointment was continued after that via three consecutive temporary Redelegation Orders.[4]

---

[2] Secretary of the Interior, Order No. 3345, Amendment No. 28, "Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions," at: https://www.doi.gov/sites/doi.gov/files/elips/documents/s0_3345_a28_.pdf .

[3] Secretary of the Interior, Order No. 3345, Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions, Amendment No. 29, at: https://www.doi.gov/sites/doi.gov/files/uploads/order-number-3345-amendment-number-29-508.pdf .

[4] On January 2, 2020, Bernhardt amended the Order to provide that Vela would continue until April 3, 2020. Order No. 3345, Amendment No. 30, at: https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3345-a30-508_0.pdf . On April 3, 2020, Bernhardt amended the Order to provide that Vela would continue until May 5, 2020. Order No. 3345, Amendment No. 31, at: https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3345-amend-31-508.pdf . On May 5, 2020, Secretary Bernhardt amended the Order to provide that

3

**Defendants' Response:**   Disputed.   Defendants admit that Mr. Vela was the Deputy Director, Operations and, in that position, was delegated the non-exclusive functions and duties of the Director of NPS beginning September 30, 2019 under SO 3345 Amendment No. 29. Defendants dispute that Mr. Vela was ever "appointed" under "temporary Redelegation Orders." Defendants admit that Mr. Vela's delegation was extended through subsequent amendments to SO 3345, through June 5, 2020.

4.      Beginning on June 4, 2020, David Vela began exercising the authority of the NPS Director under a Succession Order of that date that he issued. It was not made public and is not known to exist online; a copy is attached hereto as Exhibit A. He named his own position, "Deputy Director, Operations" as the first successor to the Director of the NPS. He delegated himself "the authority to perform all duties and responsibilities of the Director . . . to perform essential functions and activities of the office." No termination date applied.

**Defendants' Response:**   Defendants admit that on June 4, 2020, Mr. Vela submitted to George Wallace, the Assistant Secretary for Fish and Wildlife and Parks, a Memorandum entitled "Designation of Successors for Presidentially-Appointed, Senate-Confirmed Positions."   *See* Foster Decl., Ex. 6.   Mr. Wallace concurred in the Memorandum that day, thereby ratifying the Memorandum.   Defendants admit that the Memorandum was not posted online by the Department. This Memorandum set forth the priority order in which five named positions within NPS would perform the duties and responsibilities of the Director of NPS until such time as a permanent or acting Director was designated.   Defendants admit that Deputy Director, Operations was listed as in the first position of the order, which was unchanged from the prior operative order issued in

---

Vela would continue until June 5, 2020. Order No. 3345, Amendment No. 32, at: https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3345-amend-32-signed-05.05.2020-508.pdf .

November 2008.  *See id.*, Ex. 3.  Defendants further admit that pursuant to the Memorandum, Mr. Vela was delegated the authority to perform non-exclusive functions and duties of the Director of NPS.  Defendants refer the Court to the text of the order for a complete and accurate statement of its contents.

5.     On August 7, 2020, Secretary Bernhardt announced Defendant Margaret Everson, was replacing David Vela exercising the authority of the NPS Director. By Bernhardt's temporary Redelegation Order 3381, dated August 10, he formally gave Everson that authority effective immediately, with no termination date.[5]

**Defendants' Response:**  Defendants neither admit nor deny the statement contained in the first sentence of this paragraph.  The statement is immaterial, whether or not it is genuinely disputed, because it fails to provide facts that establish or support a determination of the relevant question raised in Plaintiffs' partial motion for summary judgment—whether SO 3381's delegation of authority to Ms. Everson is invalid.  Defendants further note that Plaintiffs fail to support this assertion with any citation to any part of the materials in the record, as required by Fed. R. Civ. P. 56(c)(1).  Defendants admit that Secretary Bernhardt issued SO 3381 on August 10, 2020, which delegated the non-exclusive functions and duties of the Director of NPS to Ms. Everson.

6.     Ms. Everson does not work in the NPS; she remains as "Counselor to the Secretary" per Order 3381. The NPS holds her out to the public as exercising authority of the Director in official communications and on its website.[6]

---

[5] Secretary of the Interior, Order No. 3381, Temporary Redelegation of Authority of the Director, National Park Service, at: https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3381-temp-del-dir-nps-508-compliant.pdf .
[6] E.g., NPS News Release, "Trump Administration Adds Mill Springs Battlefield National Monument    to    the    National    Park    System,"    September    22,    2020,    at:

**Defendants' Response:**  Disputed.  Defendants admit that Ms. Everson is Counselor to the Secretary but dispute that she "does not work in the NPS."  Defendants admit that NPS and the Department accurately describe Ms. Everson as exercising the delegable authority of the Director of NPS.

7.     Since taking office on August 10, 2020, Ms. Everson has performed numerous functions of the NPS Director, including, but not limited to, within one month appointing a new Assistant to the Director[7]; a new permanent Associate Director[8]; and a new Deputy Director of Operations.[9]

**Defendants' Response:**  Disputed.  Defendants note that the statement contained in this paragraph is immaterial, whether or not it is genuinely disputed, because Plaintiffs do not seek to challenge any of the purported actions identified in this paragraph.  Further, the materials cited by Plaintiffs do not support the statements for which they are cited, as each only states that Ms. Everson "announced" the hiring and/or reassignment of the three listed officials.  Notwithstanding those objections, Defendants dispute that Ms. Everson was involved in the hiring process for the current Assistant to the Director for Native American Affairs or Associate Director, Cultural Resources, Partnerships, and Science.  *See* Foster Decl. ¶¶ 20, 21.  Defendants admit that Ms.

---

https://www.nps.gov/orgs/1207/trump-administration-adds-mill-springs-battlefield-national-monument-to-the-national-park-system.htm .

[7] NPS News Release, "Dorothy FireCloud named [by Everson as] National Park Service Native American Affairs Liaison," September 9, 2020, at:  https://www.nps.gov/orgs/1207/dorothy-firecloud-named-national-park-service-native-american-affairs-liaison.htm .

[8] NPS News Release, "Joy Beasley named [by Everson as] National Park Service Associate Director of Cultural Resources, Partnerships, and Science," September 4, 2020, at: https://www.nps.gov/orgs/1207/joy-beasley-named-national-park-service-associate-director-of-cultural-resources-partnerships-and-science.htm .

[9] NPS News Release, "Shawn Benge Named [by Everson as] National Park Service Deputy Director of Operations," August 31, 2020, at:  https://www.nps.gov/orgs/1207/shawn-benge-named-national-park-service-deputy-director-of-operations.htm .

Everson signed the Reassignment package for the current Deputy Director, Operations, Shawn Benge, but note that Mr. Benge's Reassignment package was also signed by the Senate-confirmed Assistant Secretary of the Interior for Fish, Wildlife, and Parks and that his reassignment was formally approved by the Department's Executive Resources Board. *Id.* ¶ 22.

8.      President Trump has never named Ms. Everson or anyone else as the acting Director of the NPS under the Federal Vacancies Reform Act. Ms. Everson does not otherwise qualify under that Act to serve as the acting Director. President Trump has not submitted any nominee for the Director position to the current U.S. Congress for the Senate's possible confirmation. To date, this is the first presidential term since the Park Service was created in 1917 in which it has had no actual Director.[10]

**Defendants' Response:**   Defendants admit the statement in the first sentence of this paragraph, as Michael T. Reynolds, who served as Acting Director of NPS under the FVRA, served in that capacity as first assistant to the office of Director. *See* Foster Decl. ¶ 8. Defendants neither admit nor deny the statement contained in the second sentence. The statement is immaterial, whether or not it is genuinely disputed, because Ms. Everson has never been the Acting Director of NPS. *Id.* ¶ 19. In addition, the statement contains a legal conclusion, which is not a statement of material fact to which a response is required. Defendants admit the third sentence. Defendants neither admit nor deny the statement contained in the fourth sentence. The statement is immaterial, whether or not it is genuinely disputed, because it fails to provide facts that establish or support a determination of the relevant question raised in Plaintiffs' partial motion for summary judgment— whether SO 3381's delegation of authority to Ms. Everson is invalid. Accordingly, no response is

---

[10] NPS, Past Directors of the National Park Service, at: https://www.nps.gov/aboutus/nps-directors.htm.

required.

9.      Several media articles and stakeholder announcements have referred to Ms.

Everson as the acting or *de facto* Director of the NPS.[11]

**Defendants' Response:**  Defendants neither admit nor deny the statement contained in the

fourth sentence.  The statement is immaterial, whether or not it is genuinely disputed, because it

fails to provide facts that establish or support a determination of the relevant question raised in

Plaintiffs' partial motion for summary judgment—whether SO 3381's delegation of authority to

Ms. Everson is invalid.  Accordingly, no response is required.


Dated December 23, 2020                              Respectfully submitted,

                                                    JEFFREY BOSSERT CLARK
                                                    *Assistant Attorney General*
                                                    Environment & Natural Resources Division
                                                    *Acting Assistant Attorney General*
                                                    Civil Division

                                                    CHRISTOPHER R. HALL
                                                    *Assistant Branch Director*

                                                    */s/ Christopher D. Dodge*
                                                    CHRISTOPHER D. DODGE
                                                    (MA Bar No. 696172)
                                                    MICHAEL DREZNER (VA Bar No. 83836)
                                                    CHETAN A. PATIL (DC Bar No. 999948)
                                                    BRADLEY CRAIGMYLE
                                                    *Trial Attorneys*
                                                    U.S. Department of Justice
                                                    Civil Division, Federal Programs Branch

---

[11] E.g., *National Parks Traveler,* "Acting National Park Service Director Says Lack of Rangers Shouldn't Restrict Park Access," August 21, 2020, at: https://www.nationalparkstraveler.org/2020/08/update-2-acting-national-park-service-director-says-lack-rangers-shouldnt-restrict-park ; *Jackson Hole News and Guide,* "Parks free Saturday for National Public Lands Day," September 26, 2020, at: https://www.jhnewsandguide.com/the_hole_scroll/parks-free-saturday-for-national-public-lands-day/article_d2ea1a03-5fd1-5306-957e-68af985962d8.html ; Recreational Vehicles Industry Association, undated "town hall" announcement, at: https://www.rvia.org/news-insights/virtual-town-hall-acting-national-park-director-margaret-everson-announced.

P.O. Box No. 883
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-4968
Facsimile: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendants*